EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel M. Resto Laureano<br><br>Peticionario<br><br>José Resto Laureano<br><br>Recurrido | Certiorari<br><br>2021 TSPR 60<br><br>206 DPR ____ |

Número del Caso: CC-2019-121

Fecha: 3 de mayo de 2021

Tribunal de Apelaciones:

     Región Judicial de Arecibo y Aguadilla, Panel X

Abogada de la parte peticionaria:

     Lcda. Marangely González Correa
     Sociedad para Asistencia Legal

Oficina del Procurador General:

     Lcdo. Isaías Sánchez Báez
     Procurador General

     Lcda. Lisa Mónica Durán Ortiz
     Procuradora General Auxiliar

Materia: Sentencia del Triubnal con Opiniones de Conformidad y Opinión Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico | | |
| Recurrido | | |
| v. | CC-2019-0121 | |
| Ángel M. Resto Laureano | | |
| Peticionario | | |
| José Resto Laureano | | |
| Recurrido | | |

SENTENCIA

En San Juan, Puerto Rico a 3 de mayo de 2021.

Por estar igualmente dividido este Tribunal, se confirma el dictamen emitido por el Tribunal de Apelaciones.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de conformidad a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón. La Jueza Asociada señora Pabón Charneco emitió una Opinión de conformidad. El Juez Asociado señor Estrella Martínez emitió una Opinión disidente a la cual se unen la Jueza Presidenta Oronoz Rodríguez y los Jueces Asociados señores Kolthoff Caraballo y Colón Pérez.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

       Recurrido

          v.

                    CC-2019-0121

Ángel M. Resto Laureano

       Peticionario

José Resto Laureano

       Recurrido

Opinión de conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la cual se unieron los Jueces Asociados señor RIVERA GARCÍA y señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 3 de mayo de 2021.

Estoy conforme con la Sentencia que hoy se certifica debido a que el Ministerio Público probó más allá de duda razonable la culpabilidad del peticionario en todos los delitos imputados. El fallo condenatorio que emitió el Tribunal de Primera Instancia y confirmó el Tribunal de Apelaciones es correcto y está sustentado con prueba suficiente.

## I

Por hechos ocurridos el 3 de octubre de 2014, el Ministerio Público presentó una denuncia contra

el Sr. Ángel Resto Laureano, por los delitos de: (1) asesinato en primer grado, Art. 93(a) del Código Penal de 2012, 33 LPRA sec. 5142; (2) portación y uso de armas de fuego sin licencia, Art. 5.04 de la Ley de Armas de Puerto Rico, 25 LPRA sec.458c, y (3) portación y uso de armas blancas y disparar o apuntar armas, Art. 5.15 de la Ley de Armas de Puerto Rico, 25 LPRA sec. 458n. Al señor Resto Laureano se le imputó que causó la muerte del Sr. Xavier García Batista mediante disparos con un arma de fuego y un taco de billar, al actuar en concierto y común acuerdo con su hermano, el Sr. José Resto Laureano.

El juicio conjunto por tribunal de derecho en contra de los hermanos Resto Laureano, donde se presentó evidencia testimonial, ilustrativa y documental, culminó con un fallo de culpabilidad en todos los cargos imputados. El 28 de septiembre de 2016, el Tribunal de Primera Instancia condenó al Sr. Ángel Resto Laureano a cumplir una pena total de reclusión consecutiva de ciento treinta (130) años en prisión.

Inconforme, el peticionario presentó una moción de reconsideración ante el Tribunal de Primera Instancia, en la que impugnó la condena, excepto la del delito de portación y uso de armas blancas. El señor Resto Laureano alegó que el Ministerio Público no había probado más allá de duda razonable, la intención de matar, la portación y uso del arma de fuego, ni que hubiera un plan acordado para causar

la muerte de la víctima. El foro primario declaró no ha lugar la moción presentada.

Entonces, el señor Resto Laureano apeló al Tribunal de Apelaciones. En síntesis, planteó -al igual que ante el foro primario- que el Ministerio Público no satisfizo el cuántum de prueba requerido en lo relacionado a los delitos de asesinato en primer grado y portación y uso del arma. Afirmó que se le impuso responsabilidad por su mera presencia en el lugar de los hechos. Añadió que el señor García Batista portaba un arma, por lo que había actuado en defensa propia al golpearlo con un taco de billar y que dicha agresión no fue con la intención de asesinarlo.

El Tribunal de Apelaciones confirmó la sentencia apelada. Determinó que la prueba desfilada demostró de forma fehaciente que el señor Resto Laureano actuó en mutuo acuerdo con su hermano y que tuvo una participación intencional y esencial en el asesinato del señor García Batista. Además, consideró probado que, si bien el apelante no ostentaba la portación física del arma de fuego utilizada, esta estuvo bajo su control y manejo. El foro apelativo basó sus conclusiones en que, según declarado en el juicio, como parte de las confrontaciones momentos antes de los disparos, el señor Resto Laureano le dijo a la víctima: "te vas a joder".

Por otra parte, el tribunal infirió que, según los videos, los movimientos del apelante con el taco de billar en sus manos reflejaron que le dio cobertura a su hermano y

facilitó que este le disparara a la víctima. A su vez, el Tribunal de Apelaciones determinó que contrario a la alegación del apelante, el señor García Batista no podía portar un arma al momento de los hechos, ya que sus pantalones eran de algodón. Insatisfecho, el apelante presentó una moción de reconsideración ante el Tribunal de Apelaciones. Esta se declaró no ha lugar.

Posteriormente, el señor Resto Laureano acudió ante nos mediante recurso de certiorari. En síntesis, reiteró que no se probó más allá de duda razonable que él conspiró o contribuyó a los delitos imputados. Específicamente, enfatizó que la autopsia realizada reveló que no le causó daño corporal a la víctima. A su vez, insistió en que los videos demostraban que sus alegadas expresiones a la víctima fueron espontáneas y en reacción a los hechos, incluyendo que el señor García Batista portaba un arma. Impugnó las convicciones alegando que estas fueron basadas en especulaciones y que no tenían base en la prueba presentada.

En consecuencia, la Oficina del Procurador General compareció ante nos y reiteró que la prueba demostró que el peticionario Resto Laureano actuó en concierto y común acuerdo con su hermano para asesinar al señor García Batista. Sostuvo que debemos darle deferencia a la apreciación de la prueba que hizo el foro de primera instancia. Además, enfatizó que las expresiones del peticionario a la víctima y las acciones de este una vez el señor García Batista yacía

en el suelo herido, tomadas en conjunto, evidenciaban su participación como coautor de los delitos imputados.

**II**

**A.** A toda persona acusada de delito le cobija una presunción de inocencia. Art. II, Sec. 11, Const. PR, LPRA Tomo I. Esto significa que, para emitir un fallo de culpabilidad, el Ministerio Público tiene la carga probatoria. En los casos penales permea el principio fundamental de que se deben probar más allá de duda razonable todos los elementos del delito, su conexión con la persona acusada y la intención o negligencia criminal de esta. Pueblo v. Toro Martínez, 200 DPR 834 (2018); Pueblo v. Cruz Granados, 116 DPR 3 (1984); Pueblo v. Túa, 84 DPR 39 (1961).

No se requiere que se establezca la culpabilidad del acusado con certeza matemática. Pueblo v. Maisonave Rodríguez, 129 DPR 49, 71 (1991). No obstante, para determinar que la prueba controvierte la presunción de inocencia, esta debe ser suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en el juzgador. Pueblo v. Carrasquillo Carrasquillo, 102 DPR 545, 552 (1974).

Se trata de una norma de suficiencia de prueba que según la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, conlleva que se absuelva al acusado si existe duda razonable luego de un estudio de la totalidad de la evidencia. Hay duda razonable cuando el juzgador siente insatisfacción con

la prueba una vez sopesados todos los elementos involucrados en el caso. Pueblo v. Casillas, Torres, 190 DPR 398 (2014); Pueblo v. Toro Rosas, 89 DPR 169 (1963); Pueblo v. Cruz Granados, 116 DPR 3 (1984).

La presunción de inocencia asiste al acusado hasta el fallo de culpabilidad. En los remedios postsentencia, como lo son los recursos de apelación, la carga de persuadir al tribunal recae en el acusado. E.L. Chiesa Aponte, Procedimiento criminal y la Constitución: etapa adjudicativa, P.R., Ed. Situm, 2018, Sec. 4.3, pág. 154. Esto es así porque los procedimientos adjudicativos se presumen correctos. Pueblo v. Arlequín Vélez, 2020 TSPR 27, 204 DPR __ (2020).

La apreciación imparcial de la prueba que hagan los juzgadores de hechos merece respeto y confiabilidad. Pueblo v. Rosario Cintrón, 102 DPR 82 (1974); Pueblo v. Nevárez Virella, 101 DPR 11 (1973). Además, las determinaciones de hechos probados que hizo el juzgador primario no se deben descartar arbitrariamente, a menos que de la prueba admitida surja que no hay base suficiente para apoyarlas. Pueblo v. Acevedo Estrada, 150 DPR 84, 99 (2000). En los casos de naturaleza criminal, no tendremos esa deferencia si: (1) hubo prejuicio, parcialidad o pasión, o (2) la prueba no concuerda con la realidad fáctica, es increíble o imposible. Pueblo v. De Jesús Mercado, 188 DPR 467, 481 (2013), citando a Pueblo v. Santiago et al., 176 DPR 133, 147-148 (2009);

Pueblo v. García Colón I, 182 DPR 129 (2011). Consecuentemente, un tribunal revisor solo podrá intervenir con las conclusiones de hecho del foro primario cuando la apreciación total de la prueba no represente su balance más racional, justiciero y jurídico. Miranda Cruz y otros v. S.L.G. Ritch, 176 DPR 951 (2009); Cárdenas Maxán v. Rodríguez Rodríguez, 125 DPR 702, 714 (1990).

A estos fines, queda claro que la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es un asunto de hecho y derecho, revisable en apelación. Pueblo v. Irizarry, 156 DPR 780, 788 (2002) (citando a Pueblo v. Rivero, Lugo y Almodóvar, 121 DPR 454 (1988)). Nuestro esquema probatorio está revestido de deferencia a las determinaciones que hacen los juzgadores de primera instancia en cuanto a la prueba testifical, ya que dicho foro está en mejor posición para aquilatarla. Pueblo v. De Jesús Mercado, supra; Pueblo v. Rodríguez Pagán, 182 DPR 239 (2011).

Cuando convergen asuntos de suficiencia de la prueba y deferencia en cuanto a la apreciación de la prueba testifical, examinaremos si la determinación de credibilidad del foro de instancia rebasó los límites de la sana discreción judicial. Íd. Estas cuestiones deben analizarse cuidadosamente de forma tal que no se vulnere el derecho constitucional del acusado de que su culpabilidad se pruebe más allá de duda razonable. Pueblo v. Acevedo Estrada, supra.

Al entrelazar estos principios, hemos establecido que, aunque las determinaciones de hecho queden sostenidas por la prueba desfilada, podríamos revocar un fallo condenatorio si de un análisis integral de la prueba no quedamos convencidos. Pueblo v. Carrasquillo Carrasquillo, supra, pág. 551.

**B.** El Art. 93(a) del Código Penal de 2012, 33 LPRA sec. 5142, vigente al momento de los hechos, tipificaba el delito de asesinato en primer grado como "[t]oda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación". Como es conocido, en el actual Código Penal se sustituyó el elemento mental de premeditación por "a propósito" o "con conocimiento".

El asesinato en primer grado requiere tanto malicia premeditada como premeditación. Pueblo v. Negrón Ayala, 171 DPR 406 (2007). Se trata de la intención de realizar un acto que con toda probabilidad causará la muerte a una persona. Íd. La malicia premeditada consiste en ausencia de justa causa o excusa y consciencia al ocasionar la muerte de alguien. Pueblo v. Carmona Rivera, 143 DPR 907,914 (1997). Mientras, la deliberación equivale a llegar a la intención de matar, luego de alguna consideración. No importa lo rápido que el acto de matar suceda a la formación de la intención. Pueblo v. Concepción Guerra, 194 DPR 291, 305 (2015). Ambos elementos subjetivos pueden razonablemente inferirse de los hechos particulares del caso y concebirse en el momento mismo

del ataque. <u>Pueblo v. Negrón Ayala</u>, <u>supra</u>, pág. 420; <u>Pueblo v. López Rodríguez</u>, 101 DPR 897,899 (1974).

Por otra parte, en lo correspondiente a los cargos por violaciones de la Ley de Armas de Puerto Rico, <u>supra</u>, hemos reiterado que la posesión de un arma puede ser constructiva. Este tipo de posesión se da cuando sin tener físicamente el objeto se tiene poder y la intención de ejercer control o dominio sobre él. <u>Pueblo en interés menor F.S.C.</u>, 128 DPR 931, 940 (1991). Otra instancia en que se puede dar la posesión constructiva es cuando varias personas con conocimiento comparten control sobre el objeto delictivo. <u>Pueblo v. Rivera Rivera</u>, 117 DPR 283, 294 (1986).

**C.-i.** A manera de facilitar distinciones conceptuales, se define como autor de la acción criminal a aquel que principalmente causa el hecho delictivo, por lo que tiene dominio de este. L. E. Chiesa, <u>Autores y cooperadores</u>, 79 Rev. Jur. UPR 1163, 1165 (2010). Dentro de las formas de autoría se encuentra la autoría directa, la autoría mediata y la coautoría. Específicamente, cuando concurren diferentes sujetos en el quehacer delictivo, la coautoría supone que cada interventor tiene dominio del hecho, ya que las contribuciones de cada uno resultan esenciales para lograr la consumación del delito. F. Muñoz Conde & M. García Arán, <u>Derecho Penal, Parte General</u>, 7ma ed., Valencia, Tirant lo Blanch, 2007, pág. 435.

Para que se trate de coautoría, es necesario un acuerdo o plan común previo para cometer el delito, que se participe en este y que la contribución de cada individuo haya sido un eslabón importante en la producción de la ofensa. L. E. Chiesa Aponte, Derecho Penal sustantivo, 2da ed., EE.UU., Pubs. JTS, 2013, págs. 192-193. No es necesario que el coautor ejecute personalmente alguno de los actos tipificados. Es suficiente su presencia pasiva si su responsabilidad puede establecerse por actos anteriores o como el resultado de un designio común. Pueblo v. Meléndez Rodríguez, 136 DPR 587, 621 (1994); Pueblo v. Aponte González, 83 DPR 511, 519-520 (1961). "[L]a contribución material de cada coautor, sin importar cómo fue o en qué consistió, se consideran como un todo y el resultado lesivo total se le imputa a cada coautor por igual". Pueblo v. Torres Feliciano, 201 DPR 63, 85 (2018).

Hemos expresado que la mera presencia incidental durante la comisión de un delito no es suficiente para sostener una convicción a título de coautor. Pueblo v. Santiago, 176 DPR 133, 147 (2009). Es necesario que las circunstancias revelen que se trató de una participación voluntaria y consciente en la ejecución del delito. Íd. De este modo, hemos reconocido que la coautoría puede establecerse mediante prueba directa o circunstancial. Pueblo v. Ortiz Martínez, 116 DPR 139 (1985).

Por otro lado, es considerado como "partícipe" el que colabora intencionalmente en la realización de un hecho delictivo ajeno, sin tener control de este. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 191. Dentro de las formas de participación se encuentra la inducción y la cooperación. La cooperación a su vez se divide en dos tipos: cooperación necesaria y cooperación no necesaria. La responsabilidad de los partícipes, por ser accesoria, es derivativa de la responsabilidad del autor. L.E. Chiesa, Autores y cooperadores, supra, págs. 1171-1172. Puntualizamos la accesoriedad del partícipe ya que, independientemente de que se le imponga la misma pena que al autor, solo se le castigará cuando exista un hecho antijurídico ajeno. L.E. Chiesa, Autores y cooperadores, supra, pág. 1170.

Debido a las diversas modificaciones que ha sufrido nuestro ordenamiento jurídico penal y la posible confusión entre las figuras de coautoría, cooperación necesaria y cooperación, pasamos a discutir estas figuras teniendo en cuenta sus definiciones conceptuales y su interrelación con la pena que se le ha atribuido. Cabe destacar que, a pesar de las diferentes transformaciones en nuestro Código Penal, queda claro que la mera presencia en el lugar de los hechos no convierte a la persona en autor ni cooperador, aunque la presencia puede tomarse en cuenta bajo un análisis de la totalidad de las circunstancias. Pueblo v. Agosto Castro,

102 DPR 441 (1974); Pueblo v. Aponte González, 83 DPR 511 (1961). Además, **debe probarse, fuera de duda razonable, la intervención intencional o que se realizaron actos encaminados a facilitar la consumación del delito**. (Énfasis suplido) Pueblo v. Lebrón Morales, 115 DPR 113 (1984).

ii. Mediante el Código Penal de 2004, Ley Núm. 149-2009, 33 LPRA se. 4629 et seq., se adoptó por primera vez en nuestro ordenamiento la teoría de la diferenciación. Pueblo v. Sustache Sustache, 176 DPR 250, 299 (2009). Esta teoría distingue entre los sujetos activos de un hecho punible, clasificándolos en autores o partícipes. Bajo esta concepción se tiende a penalizar más severamente al autor del delito que al cooperador. Pueblo v. Sustache Sustache, supra, pág. 297

El Art. 43 del Código Penal de 2004, 33 LPRA sec. 4671(d), clasificaba quiénes eran considerados autores. Entre ellos se encuentran los que "(d) [c]ooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo". A tales efectos, este inciso incluía a los coautores y a los cooperadores necesarios. Pueblo v. Sustache Sustache, supra, págs. 303-304. Ambas figuras parten de la premisa de que se aportan contribuciones medulares a la consecución del hecho delictivo. Pueblo v. Sustache Sustache, supra, pág. 303.

La coautoría presupone: (1) un acuerdo de distribución de funciones entre las personas implicadas y (2) la ejecución común del hecho. Pueblo v. Sustache Sustache, supra, pág. 302 (citando a L.E. Chiesa Aponte, Derecho Penal sustantivo, op. cit., págs. 178-179). La distinción entre el cooperador necesario y el coautor estriba en que la contribución del coautor se da durante la ejecución del delito, mientras que la del cooperador necesario se da en los actos preparatorios. Pueblo v. Sustache Sustache Sustache, supra, pág. 303.

Asimismo, debemos señalar que el Art. 44 del Código Penal de 2004, 33 LPRA sec. 4672, clasificaba como cooperadores a "[l]os que sin ser autores, con conocimiento, cooperan de cualquier otro modo en la comisión del delito". La participación del cooperador no es imprescindible ni indispensable. Basta un favorecimiento eficaz del hecho. Pueblo v. Sustache Sustache, supra, pág. 305. De ordinario, la conducta punible en calidad de cooperador es aquella que acelera, asegura, incrementa o facilita la ejecución del hecho o intensifica su resultado. Íd., pág. 306. La conducta del cooperador es secundaria al delito ajeno y de poco valor, por lo que no es indispensable para la ejecución del delito. D. Nevares-Muñiz, Derecho Penal puertorriqueño parte general, 7ma ed. rev., San Juan, Instituto para el Desarrollo del Derecho, 2015, pág. 366.

Siendo así, el cooperador es aquel que no tiene conocimiento pleno del delito. Pueblo v. Sustache Sustache,

supra, pág. 313. "Lo único que se requiere para configurar la intención delictiva en la modalidad de cooperación, es que el cooperador conozca las circunstancias del hecho, de tal manera que el resultado criminal pueda serle imputado como una consecuencia natural de su conducta". Íd., pág. 321.

**iii**. Por otra parte, el Código Penal de 2012, Ley Núm. 146-2012, 33 LPRA sec. 5001 et seq., previo a ser enmendado, atendía la concurrencia de distintas personas en la acción criminal, estableciendo una sola categoría de autores, todos con igual tipo de responsabilidad. D. Nevares-Muñiz, op. cit., pág. 353. Esta agrupación refleja la teoría de equivalencia, es decir, se penalizaba a todos los interventores con igual tipo de responsabilidad penal sin diferenciar la calidad en que se participó. Íd. De esta manera, la figura del cooperador se integró a la del autor.

El Art. 44 del Código Penal de 2012, 33 LPRA sec. 5067 consideraba como autores, entre otros, a: "(a) Los que toman parte directa en la comisión del delito… (d) [l]os que cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo… [y] (h) [l]os que cooperan de cualquier otro modo en la comisión del delito". Íd. Nótese que el conocimiento que se requería era aquel en el que la persona es consciente de la existencia de la

circunstancia o de que la producción del resultado es prácticamente segura. D. Nevares-Muñiz, op. cit., pág. 367.

No obstante, la Ley Núm. 246-2014 restituyó la participación a título de cooperador y con ello se regresó a la teoría de diferenciación. D. Nevares-Muñiz, op. cit., pág. 353. Con este cambio, se vislumbra al cooperador como aquel que colabora con conocimiento, pero no participa directamente en la planificación o ejecución del delito. Íd. De esta manera, al igual que el Código Penal de 2004, al cooperador se le exige un grado de responsabilidad menor ya que su participación es poco significativa. Íd.

A pesar de las enmiendas aprobadas en 2014, se continuó denominando "autores" a los coautores y cooperadores necesarios, pero se modificó el lenguaje para definir a estos últimos como "[l]os que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo". Art. 44 del Código Penal de 2012, según enmendado por la Ley Núm. 246-2014, 33 LPRA sec. 5067.

Nuestra decisión más importante acerca de las figuras del cooperador y coautor se dio en Pueblo v. Sustache Sustache, supra. Allí expresamos que no era necesario que diferenciáramos entre la coautoría y la cooperación necesaria ya que el Art. 43(d), supra, incluía a quien realizara una contribución medular tanto en la ejecución del

delito como en actos preparatorios. Pueblo v. Sustache Sustache, supra, pág. 304. Sin embargo, discutimos entonces la teoría de los grados de necesidad. Esta distingue entre la cooperación necesaria y la innecesaria, según el valor que tienen los actos con relación al resultado. Esta doctrina postula que los actos son necesarios cuando ningún otro interventor los hubiera podido sustituir. Por el contrario, la cooperación será innecesaria si el autor podía ejecutar el hecho sin la participación del cooperador. Íd., pág. 307.

En aquella ocasión, teniendo en cuenta las diversas teorías valorativas, diferenciamos las figuras del coautor y el cooperador necesario, por un lado, y la del mero cooperador, por otro lado, porque: (1) la colaboración del coautor/cooperador necesario es indispensable para la comisión del delito, mientras que la del mero cooperador no lo es y (2) el coautor tiene mayor conocimiento sobre el hecho delictivo que el mero cooperador. Pueblo v. Sustache Sustache, supra, págs. 3010-3011.

Como vemos, aun cuando nuestra decisión en Pueblo v. Sustache Sustache, supra, tenía como referente el antiguo Código Penal de 2004, esta es armonizable con las enmiendas realizadas en 2014. Aunque las enmiendas establecen que el tipo de coautoría/cooperación necesaria dispuesta en el Art. 44(d) requiere que la contribución al delito haya sido significativa, en lugar de imprescindible, ambos lenguajes contemplan una intervención de magnitud o valor

considerable. "En el caso del autor descrito en el Art.44(d) su participación es necesaria y significativa (o de magnitud o valor considerable) para la ejecución del delito". D. Nevares-Muñiz, op. cit., pág. 356. Por consiguiente, la ayuda necesaria y esencial es aquella que aumentó significativamente la probabilidad de que el delito se consumara. E.L. Chiesa, Autores y cooperadores, supra, pág. 1177.

El cambio en lenguaje coincide con la recomendación del profesor y tratadista Ernesto Chiesa, quien acertadamente destacó que "Sustache no logra articular un criterio coherente que ayude a distinguir entre cooperaciones necesarias, punibles como autoría y complicidades innecesarias, punibles como cooperación." Íd., pág. 1164.

Chiesa destaca que corresponde hablar de coautoría solo cuando hay un acuerdo previo. Si la intervención no es en virtud de un acuerdo previo se trata de una cooperación necesaria. Íd., pág. 1169. A su vez, el cooperador necesario es aquel que aporta un acto esencial para la consumación del delito. Íd., pág. 1172.

El enfoque en la probabilidad de consumación exitosa del delito como distintivo entre cooperación necesaria y la innecesaria es cónsono con las enmiendas de 2014. Este análisis postula que si

> [l]a contribución del cooperador aumentó significativamente la probabilidad de que el delito fuera consumado exitosamente, debe concluirse que la ayuda proporcionada por el

cooperador era necesaria. Si no, si se concluye que la contribución del cooperador no aumentó significativamente las probabilidades que se consumara el delito, debe concluirse que la ayuda proporcionada no fue necesaria. Íd., pág. 1177.

Además, Chiesa propone que el análisis en casos de acciones debe girar en torno a si la ayuda del cooperador puede considerarse de especial importancia a la luz del plan del autor y no de que hubiese ocurrido sin su ayuda. Íd., pág. 1188.

La aportación del cooperador necesario puede consistir tanto en hechos como en consejos. Por lo tanto, no siempre se tratará de una reacción materialmente causal entre la aportación y la consumación del delito. E. Bacigalupo, Derecho Penal, parte general, 2da ed., Buenos Aires, Ed. Hammurabi SRL, 1999, pág. 529. Cada coautor responde por el resultado lesivo total sin importar cuál haya sido su contribución material. Pueblo v. Torres Feliciano, supra, pág. 101. Siendo así, al analizar la cooperación necesaria, debe determinarse si en efecto la aportación facilitó la comisión del hecho. E. Bacigalupo, op. cit., pág. 530.

En consideración a lo anterior, al sopesar si se trata de una cooperación necesaria debe evaluarse si los actos facilitaron significativamente la comisión del delito, así como si eso representó un eslabón importante en el quehacer delictivo y, por ende, si se trató de una ayuda esencial.

**III**

Este caso nos lleva a evaluar si se probó más allá de duda razonable la culpabilidad del peticionario, Sr. Ángel Resto Laureano, por su participación en el asesinato del señor García Batista. Queda claro que los actos del señor Resto Laureano quedaron cabalmente establecidos. Solo resta determinar si su participación fue en calidad de coautor, cooperador necesario o cooperador.

Luego de examinar los actos, las circunstancias que rodearon la muerte, las manifestaciones, la conducta del acusado y los hechos del crimen, entiendo que el fallo condenatorio que emitió el Tribunal de Primera Instancia y confirmó el Tribunal de Apelaciones es correcto y está sustentado con prueba suficiente.

De los videos y los testimonios se desprende que el peticionario Resto Laureano no fue parte de la primera interacción donde su hermano golpeó en la cara a la víctima. Sin embargo, luego el peticionario Resto Laureano le dijo al señor García Batista: "te vas a joder". Surge también que una vez los involucrados salieron del área de la barra, el peticionario Resto Laureano tomó un taco de billar y se dirigió a la acera, a pocos pasos de la víctima y su pareja. Los videos mostraron que el peticionario Resto Laureano señaló hacia la víctima, mirando a su hermano, segundos antes de que este último disparara. Cuando la víctima cayó al suelo, el peticionario se dirigió a golpearla en repetidas ocasiones con un taco de billar. Tal fue su agitación y

desenfreno que, para poder continuar con sus golpes, empujo al suelo a la pareja de la víctima cuando ella intento detenerlo. Siendo así, quedo plasmada su intención de culminar lo que su hermano inició.

Debemos recordar que el acuerdo mutuo que supone la coautoría puede producirse en el acto y en solo instantes. Considero, por eso, que el Ministerio Público probó más allá de duda razonable que el peticionario fue coautor del delito. Es decir, hubo prueba fehaciente del acuerdo mutuo entre los hermanos Resto Laureano y que el peticionario Ángel Resto Laureano realizó una contribución esencial a la muerte del señor García Batista. Antes de que se produjeran los disparos, el peticionario Resto Laureano hizo amague de lanzar un golpe a la víctima, pero se detuvo, miró a su hermano y este último disparó. El peticionario le brindó cobertura a su hermano y distrajo a la víctima, facilitando que se le disparara.

Es evidente que la intervención del peticionario Resto Laureano fue intencional y que contribuyó de manera esencial a que su hermano disparara en el momento que lo hizo. Por eso, lo mínimo que podemos concluir es que el peticionario fue un cooperador necesario. El peticionario Resto Laureano vio que su hermano portaba un arma de fuego y que se proponía disparar. En ningún momento trató de evitar el incidente, sino que, por el contrario, tuvo un rol activo durante la ocurrencia del crimen. Por ende, es forzoso concluir que la

participación del peticionario Resto Laureano fue de especial importancia en el acontecer delictivo de su hermano, debido a que fue esencial para consumar el delito. Por ello, procede imponer pena a título de autor, según el Art. 44(d) del Código Penal de 2012, _supra_.

Como hemos discutido, no es determinante que el peticionario no le causó daño corporal a la víctima al atacarlo con el taco de billar. La aportación del cooperador necesario puede consistir tanto en hechos como en consejos. No se requiere que cause por su propia mano el hecho delictivo y no siempre se tratará de una reacción materialmente causal. _Pueblo v. Torres Feliciano_, _supra_, pág. 101. Luego de considerar todas las circunstancias, el juzgador concluyó que el peticionario Resto Laureano realizó contribuciones medulares que contribuyeron al asesinato del señor García Batista.

Un análisis sereno e integral llevó al juzgador de los hechos a concluir que los actos del peticionario Resto Laureano facilitaron y promovieron el asesinato del señor García Batista. Esa determinación merece deferencia.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel M. Resto Laureano<br><br>Peticionario<br><br>José Resto Laureano<br><br>Recurrido | CC-2019-0121 | |

Opinión de conformidad emitida por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 3 de mayo de 2021.

Por entender que el dictamen del foro de instancia que declara culpable al peticionario de todos los delitos imputados está fundamentado en prueba suficiente en Derecho, estoy conforme con la Sentencia que hoy se dicta.

Luego de examinar serena y justamente la totalidad de la prueba de este caso, concluyo que se probó más allá de duda razonable la intervención del Sr. Ángel Resto Laureano (peticionario) en el asesinato imputado. Para esta determinación, el foro de instancia consideró el testimonio de una testigo presencial (quien testificó sobre una amenaza que hiciera el peticionario a la víctima), imágenes de video que documentan la sucesión de eventos y el comportamiento del peticionario antes y durante el ataque, así como el informe y testimonio pericial que confirman que la víctima estaba de

espaldas al ser atacado. Por lo tanto, soy de la opinión de que no hay razones por las que debemos intervenir con la evaluación de la prueba realizada por la juzgadora de hechos.

I

Por hechos ocurridos el 3 de octubre de 2014, al peticionario se le acusó por los delitos de asesinato en primer grado, Art. 93(a) de la Ley Núm. 146-2012, 33 LPRA sec. 5142, conocida como Código Penal de Puerto Rico de 2012, e infracciones a los Arts. 5.04, 5.05 y 5.15 de la Ley Núm. 404-2000, 25 LPRA secs. 458c, 458d y 458n, conocida como Ley de Armas de Puerto Rico. Se le imputó haber actuado en concierto y mutuo acuerdo con su hermano, el Sr. José Resto Laureano (señor Resto Laureano), para asesinar al Sr. José Xavier Antonio García Batista (la víctima) mediante varios disparos con un arma de fuego y varios golpes con un taco de billar.

El Ministerio Público presentó ante el Tribunal de Primera Instancia evidencia documental, testimonial e ilustrativa. Resaltamos que entre la prueba presentada se encuentra el testimonio de una testigo presencial, grabaciones de video que capturan los eventos imputados desde siete (7) ángulos diferentes, un informe médico forense y el testimonio pericial.[1]

---

[1] En lo pertinente, el Ministerio Público también presentó el testimonio de los agentes de la Policía de Puerto Rico siguientes: el Agente Pedro Rolón Ortiz (primer policía que llegó a la escena), el Agente Radamés Miranda Pérez (policía que diligenció la orden de arresto del peticionario), el Agente Carlos Cruz Román (agente investigador del caso), el Agente Melvin Soberal Morales (agente que recuperó las imágenes de la grabadora de video ante la solicitud del agente Cruz Román), el Agente Alex Cintrón Castellano (agente que analizó el vehículo de la víctima) y

De la evidencia presentada se desprende que la Sra. Tania Rodríguez, testigo presencial de los hechos, tuvo una relación de pareja hasta el 2014 con el Sr. José Resto Laureano, con quien procreó dos (2) hijos. Después de su separación comenzó una relación de convivencia con la víctima. Esto provocó tensión con el señor Resto Laureano.[2] El peticionario, quien es el hermano del señor Resto Laureano, lo acompañaba al momento de los hechos.

Los eventos que culminaron con la muerte de la víctima ocurrieron dentro y fuera del negocio *Beer Stop* en Manatí. De la evidencia presentada se desprende que el negocio *Beer Stop* tenía en la parte frontal una rampa ancha (a mano izquierda) y una terraza abierta (a mano derecha). Tanto la rampa como la terraza daban acceso a la puerta de la barra desde la acera y la calle. En el centro de la terraza se encontraba una mesa de billar. A su vez, de las imágenes de video se puede observar a extrema derecha un segundo acceso a la terraza que daba hacia la acera y la carretera. Este segundo acceso a la terraza estaba adyacente a un negocio de telefonía Claro. Frente a este negocio de telefonía, ubicado justo después de la terraza, estaba estacionado el vehículo de la víctima (un vehículo tipo *pick up* marca Nissan, modelo Frontier color blanco). Cabe señalar, que **desde la terraza y la rampa se**

---

el Agente Orlando de Jesús Rodríguez. Además, presentó el testimonio de la Examinadora de Armas del Instituto de Ciencias Forenses, Angélica Resto Rivera, el Sr. Eliud Rubio Negrón (comerciante de ventas de celulares que dio acceso a las grabaciones del negocio de telefonía Claro) y el Dr. Javier Gustavo Serrano.

[2] *Transcripción de la prueba oral*, pág. 157.

**puede apreciar el flujo vehicular frente a *Beer Stop* y desde la calle se pueden observar las actividades y las personas en la terraza.**

A eso de las 10:00 p.m. del 3 de octubre de 2014, la señora Rodríguez estaba jugando billar en la terraza abierta del negocio, mientras que la víctima estaba dentro del negocio en el área de la barra cerca de la puerta. Un vehículo marca Toyota, modelo Tacoma, color gris **transitó frente a *Beer Stop* y retrocedió hacia el negocio.** En este vehículo se encontraban los hermanos Resto Laureano y sus respectivas parejas. Posteriormente, los hermanos Resto Laureano se bajaron del vehículo mientras que sus parejas permanecieron en este.

El señor Resto Laureano se dirigió hacia la puerta del negocio. Por su parte, el peticionario se detuvo a hablar con personas en la acera frente a la rampa. Tras entrar el señor Resto Laureano por la puerta, se observa en el video un intercambio de palabras con la víctima. El señor Resto Laureano le propinó un golpe en la cara. En cambio, la víctima se mantuvo quieta y no respondió a la agresión. Segundos más tarde, la señora Rodríguez, e inmediatamente después el peticionario, entraron por la puerta. La señora Rodríguez se dirigió hacia el señor Resto Laureano y comenzó a discutir con este. La víctima sostuvo a la señora Rodríguez por el brazo y le insistió que se fueran del lugar. **Se puede observar que el peticionario hace algunos comentarios a la pareja mientras se retiraba. La señora Rodríguez declaró que la víctima "me**

**insistió que nos fuéramos varias veces, escuché que [el peticionario] le decía 'te vas a joder'" al señor García Batista.**

La víctima y la señora Rodríguez se dirigieron por la rampa y giraron hacia la derecha por la acera en dirección a la Nissan Frontier de la víctima estacionada frente al negocio de telefonía. El señor Resto Laureano los siguió por la misma ruta. Sin embargo, la señora Rodríguez logró soltarse de los brazos de la víctima y fue en dirección a la Tacoma que justo en esos momentos estaba dando reversa para entrar a la vía de rodaje cerca del vehículo de la víctima. La señora Rodríguez procedió a golpear con sus manos y piernas las puertas y cristales de la Tacoma. Aunque la víctima la siguió brevemente y le dijo "ma vente vámonos",[3] la víctima desistió de disuadir a la señora Rodríguez y se dirigió hacia su vehículo. La conductora de la Tacoma "salió chillando goma".[4]

Cabe señalar que **simultáneamente con la salida de los demás involucrados del área de la barra, el peticionario también fue tras la pareja y cortó camino por la terraza, tomó un taco de billar, y salió corriendo a la acera pocos pasos detrás de la víctima y la señora Rodríguez. Se puede observar en el video que el peticionario se adelantó a su hermano y se ubicó (taco en mano) detrás del vehículo de la víctima incluso antes de que la víctima se dirigiera a abrir la puerta de su**

---

[3] *Transcripción de la prueba oral*, pág. 164.
[4] *Íd.*

vehículo. **También se puede apreciar claramente que el peticionario señaló hacia la víctima con el brazo completamente extendido poco antes de que su hermano llegara. Asimismo, al ver el video tomado desde el ángulo del negocio de telefonía observamos que cuando el peticionario señala a la víctima, esta se encontraba de espaldas al peticionario abriendo la puerta del vehículo.** Acto seguido, el señor Resto Laureano se ubicó detrás de la Nissan Frontier y extendió los brazos. Entonces se puede observar el resplandor de los disparos en dirección a la víctima.

Surge del informe médico forense, así como del testimonio del Dr. Javier Gustavo Serrano, que **la víctima recibió tres (3) impactos de bala, dos de ellos en la espalda y una tercera bala que atravesó sus muslos. Por lo tanto, quien agredió estaba detrás de la víctima, ligeramente al lado derecho.[5] Inmediatamente luego de la detonación, el peticionario procedió a golpear a la víctima malherida en el suelo con el taco de billar.** Tras un forcejeo entre el peticionario y la señora Rodríguez, los hermanos Resto Laureano se retiraron de la escena. La víctima falleció en la ambulancia que lo transportaba al hospital.

Por estos hechos, el peticionario fue declarado culpable de todos los delitos acusados. Posteriormente, el Tribunal de

---

[5] *Transcripción de la prueba oral*, pág. 324 ("[I]ndependientemente de cuál sea la posición, el agresor tiene que estar a la espalda de, de, del agredido y, y, ligeramente a la derecha".). Informe médico forense, Apéndice del *Certiorari*, pág. 26.

Apelaciones confirmó las Sentencias apeladas y concluyó que la participación del peticionario no se limitó a una simple agresión con el taco de billar.[6] Específicamente expresó que:

> La prueba desfilada demostró de forma fehaciente que la realidad fue distinta a la que nos plantea Ángel. Según ya hemos reseñado, éste lleg[ó] junto a José al Beer Stop. Es cierto que mientras José entró al negocio y tuvo la confrontación verbal inicial y le dio la bofetada a Aby,[7] Ángel no estuvo presente. Sin embargo, momentos después entró y se paró cerca de la puerta. Conforme se declaró en el Juicio, antes de irse Aby del negocio Ángel le dijo "te vas a joder". Una vez Aby y Tania salieron del negocio Ángel y su hermano, les siguieron. Mientras su hermano bajó la rampa del negocio y dobló por la acera hacia la guagua Frontier de Aby, Ángel salió del negocio, pasó por la terraza, tomó un taco de billar de camino al área cercana a dicho vehículo.
>
> Con el taco de billar en sus manos, Ángel se mantuvo cercano a Aby, lo que inferimos le dio cobertura a José y posibilitó que le disparase a Aby. Aun si aceptáramos la teoría que nos plantea Ángel, tendríamos que creer que fue una mera coincidencia que, solo con un taco de billar en mano, se acercó a Aby y señaló hacia él unos instantes antes de que su hermano le disparó. Sabido es que los tribunales no debemos creer lo que nadie más creería. *Pueblo v. Luciano Arroyo*, 83 DPR 573, 582 (1961). Nótese que, de haber sido cierto que Aby tenía un arma, y que Ángel no sabía que José estaba armado, lo más lógico hubiese sido que Ángel hubiese intentado distanciarse, no acercarse a Aby. Consideramos probado que si bien Ángel no ostentaba la posesión física del arma que portó y disparó José, ésta también estuvo bajo su control y manejo.
>
> Todo apunta a que Ángel sabía que José estaba armado. Como declaró el agente Cruz y surge del video, Ángel hizo un amague de lanzar un golpe a Aby pero se detuvo, momentos antes de los disparos. Luego de que Aby estaba en el suelo, a raíz de los disparos, Ángel no se distanció del

---

[6] La Juez Gómez Córdova emitió un Voto de conformidad y disenso en parte. Apéndice del *Certiorari*, pág. 249.
[7] El Sr. José Xavier Antonio García Batista (la víctima) era conocido como "Aby".

área, sino que se acercó a donde éste yacía y lo golpeó con el taco de billar. Tal fue su interés de acercarse a Aby que empujó al piso a Tania cuando ésta trat[ó] de intervenir para detenerlo. En resumidas cuentas, entendemos que quedó establecido que Ángel no estuvo meramente presente la noche de los hechos, sino que tuvo una participación intencional y esencial en el asesinato de Aby".[8]

Declarada no ha lugar la moción de reconsideración presentada ante el Tribunal de Apelaciones, el peticionario acudió oportunamente ante nos y señaló como error que el foro apelativo intermedio confirmara las determinaciones de culpabilidad por los delitos de asesinato en primer grado, portación y uso de armas de fuego sin licencia, y disparar o apuntar armas de fuego cuando la prueba de cargo no los estableció más allá de duda razonable.[9] Así las cosas, expedimos el recurso en reconsideración el 31 de mayo de 2019.

II

A.

La Constitución de Puerto Rico garantiza a todo acusado de delito el derecho fundamental a la presunción de inocencia en un proceso criminal. Art. II, sec. 11, Const. ELA, LPRA, Tomo 1. Asimismo, por imperativo constitucional el Estado debe probar más allá de duda razonable cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este. *Pueblo v. Toro Martínez*, 200 DPR

---

[8] Sentencia de 17 de diciembre de 2018, Apéndice del *Certiorari*, págs. 246-247.
[9] El peticionario aceptó la comisión del delito de portación y uso de armas blancas.

834 (2018), *Pueblo v. Santiago et al.*, 176 DPR 133 (2009), *Pueblo v. Irizarry*, 156 DPR 780 (2002), *Pueblo v. Acevedo Estrada*, 150 DPR 84 (2000). Es decir, el Estado debe presentar prueba satisfactoria y suficiente en derecho que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, 200 DPR 834 (2018); *Pueblo v. Irizarry*, supra. Esto, pues "duda razonable" no es una duda especulativa o imaginaria ni cualquier duda posible, sino que es aquella duda fundada que surge como producto del raciocinio de todos los elementos de juicio involucrados en el caso y por la que el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad. *Pueblo v. Santiago et al.*, supra; *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Casillas, Torres*, 190 DPR 398 (2014).

Aunque la determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación como cuestión de derecho, la apreciación de la prueba corresponde en primera instancia al foro sentenciador y esa determinación merece gran deferencia de los foros apelativos. Esto, dado que los jurados y los jueces de primera instancia están en mejor posición de apreciar y aquilatar la prueba. *Pueblo v. Casillas, Torres*, supra; *Pueblo v. Rodríguez Pagán*, 182 DPR 239 (2011). Por lo tanto, los foros apelativos solo intervendrán con la apreciación de la prueba del Tribunal de Primera Instancia ante la presencia de los elementos de

pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique.[10] *Pueblo v. Irizarry*, supra. *Pueblo v. Casillas, Torres*, supra. *Pueblo v. De Jesús Mercado*, 188 DPR 467 (2013).

B.

Al momento de los hechos, el Art. 92 del Código Penal de 2012, 33 LPRA sec. 5141, definía asesinato como "dar muerte a un ser humano con intención de causársela". Asimismo, y en lo pertinente, el Art. 93 del Código Penal de 2012, 33 LPRA sec. 5142, indicaba que constituía asesinato en primer grado: "(a) Toda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación".

Por otro lado, el Art. 5.04 de la Ley de Armas, 25 LPRA sec. 458c, disponía en lo pertinente que: "Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave…". Por su parte, el Art. 5.15 de la Ley de Armas, 25 LPRA sec. 458n, disponía que: "(a) [i]ncurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de

---

[10] Véase *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018), para una exposición detallada de los elementos de "pasión, prejuicio, parcialidad o error manifiesto".

tiro autorizado:(1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna".

Es de particular importancia indicar que al momento de los hechos, estaba vigente el Art. 44 de la Ley Núm. 146-2012, conocida como Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5067, por el que se consideraban autores:

(a) Los que toman parte directa en la comisión del delito.

(b) Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.

(c) Los que se valen de una persona inimputable para cometer el delito.

(d) Los que cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo.

(e) Los que se valen de una persona jurídica para cometer el delito.

(f) Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.

(g) Los que teniendo el deber de garante sobre un bien jurídico protegido, conociendo el riesgo de la producción de un resultado delictivo por ellos no provocado que lo pone en peligro, no actúen para evitarlo.

(h) Los que cooperan de cualquier otro modo en la comisión del delito.

Por lo tanto, el Código Penal de Puerto Rico de 2012, al momento de los hechos y previo a las enmiendas de la Ley Núm. 246-2014, mantenía un tratamiento indiferenciado entre los que intervenían en la comisión de un delito, y por lo tanto, los castigaba como autores.[11]

## III

A la luz de los criterios de autoría vigentes al momento de los hechos, sostengo que se probó más allá de duda razonable que el peticionario fue autor de los delitos de asesinato en primer grado, portación y uso de armas de fuego sin licencia, y disparar o apuntar armas.

Luego de un análisis de la totalidad de la prueba, el Tribunal de Primera Instancia determinó que el Ministerio Público probó todos los elementos de los delitos y su conexión con el peticionario. Así, el Tribunal de Primera Instancia dirimió la credibilidad de los testimonios presentados y dio el peso correspondiente al testimonio de la señora Rodríguez, quien también testificó sobre la amenaza que el peticionario le hiciera a la víctima antes del ataque.

Aunque la apreciación de la prueba corresponde en primera instancia al juzgador de los hechos y la presencia o ausencia de premeditación es una cuestión de hechos a ser resuelta por

---

[11] Véase *Pueblo v. Sustache Sustache*, 176 DPR 250 (2009), para una exposición detallada de la teoría de la equivalencia aplicable en Puerto Rico hasta la adopción del Código Penal de Puerto Rico de 2004.

este, de nuestro examen de la prueba no surge pasión, prejuicio, parcialidad o error manifiesto por parte del foro sentenciador. *Pueblo v. Concepción Guerra*, 194 DPR 291 (2015).[12] Tampoco surge que la prueba no concuerde con la realidad fáctica ni que sea inherentemente imposible o increíble. Todo lo contrario, de un análisis desapasionado de la totalidad de la prueba presentada, en particular de las manifestaciones del acusado y su conducta anterior, concomitante y posterior al crimen, se sostiene la convicción del peticionario. *Id.*

Ciertamente los eventos de la noche del 3 de octubre de 2014 ocurrieron en minutos. Sin embargo, "la deliberación como la premeditación pueden existir y concebirse en el momento mismo del ataque". *Pueblo v. López Rodríguez*, 101 DPR 897, 899 (1974). Así, de los videos se puede observar cuando el vehículo de los hermanos Resto Laureano circula frente al negocio y retrocede para estacionarse. También se observa la interacción entre los involucrados, particularmente la actitud pasiva de la víctima evitando toda confrontación ante las agresiones físicas y verbales recibidas. Además, se observa cuando el peticionario gesticula algunas palabras en el bar y que, según el testimonio de la señora Rodríguez, el peticionario le dijo a la víctima "te vas a joder".

---

[12] Para una exposición detallada sobre deliberación y premeditación, véase, *Pueblo v. Concepción Guerra*, 194 DPR 291 (2015).

Por otro lado, aunque se alega que la víctima portaba un arma en sus pantalones y que al ser herido la sostenía, nunca se observa un arma en las manos o la ropa de este. Tampoco esta fue hallada en la escena del crimen. Asimismo, se suma la conclusión del informe forense de que la víctima fue herida de bala por la espalda mientras intentaba abordar su vehículo. Tras los disparos, el peticionario continuó agrediendo a la víctima con un taco de billar.[13]

De las imágenes de los videos se pueden apreciar las expresiones y comportamiento del peticionario señalando a la víctima antes de que su hermano le disparara. Las imágenes hablan por sí solas y son de suficiente calidad como para identificar al peticionario y apreciar sus movimientos. De estas imágenes se puede observar con suficiente certeza como el peticionario adelantó a su hermano velozmente a través de la terraza hasta llegar a la víctima. Además, se aprecia como este sostuvo el taco en mano en posición de ataque y con el brazo señala a la víctima antes de que su hermano llegara y le disparara, facilitando así el posicionamiento de su hermano. Acto seguido, el peticionario lo ataca con el taco en el piso mientras este yacía mal herido.

---

[13] *Pueblo v. Rosario*, 160 DPR 592 (2003); *Pueblo v. Dingui Ayala*, 103 DPR 528, 530-531 (1975) ("La prueba de cargo clara y convincente establece la culpabilidad del acusado del delito de asesinato en primer grado. [E]l acusado… le ataca por la espalda tirándolo al suelo donde le cortó la vida mediante numerosas heridas inciso-punzantes y penetrantes"); *Pueblo v. Ramos Padilla*, 88 DPR 384 (1963) ("Constituye asesinato en primer grado el dar muerte a una persona desarmada acercándosele sigilosamente y clavándole un cuchillo por la espalda".).

Examinados todos estos elementos, existe prueba suficiente que apoya la determinación del foro primario por lo que debemos mantener la deferencia a la apreciación del juzgador. Mi conciencia está tranquila tras un minucioso examen de la prueba por lo que no hay razones para intervenir en la evaluación de la prueba realizada por la juzgadora.

**IV**

Por las razones expresadas, procede que se confirme el dictamen del Tribunal de Apelaciones. El dictamen del Tribunal de Primera Instancia está fundamentado en prueba suficiente en Derecho y no hay razones por las que debemos intervenir con la evaluación de la prueba realizada por la juzgadora.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Ángel M. Resto Laureano<br><br>Peticionario<br><br>José Resto Laureano<br><br>Recurrido | CC-2019-0121 | Certiorari |

Opinión disidente emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ, a la cual se le unen la Jueza Presidenta ORONOZ RODRÍGUEZ y los Jueces Asociados señores KOLTHOFF CARABALLO y COLÓN PÉREZ

En San Juan, Puerto Rico, a 3 de mayo de 2021.

En esta ocasión, me corresponde disentir ante un dictamen que, además de ser erróneo en derecho, resulta injusto. Los criterios que exige nuestro ordenamiento para que una persona se considere coautora de un delito no están presentes en el caso de autos. Particularmente, los referentes a los cooperadores necesarios y los cooperadores no necesarios.

Así, tras un estudio minucioso del derecho aplicable y de la prueba presentada en el juicio, no me queda otra alternativa que concluir que la culpabilidad del Sr. Ángel Resto Laureano no se probó más allá de duda razonable. Por ello, disiento.

**I**

**A.**

Por hechos ocurridos el 13 de octubre de 2014, el Ministerio Público acusó al Sr. Ángel Resto Laureano (peticionario) por los siguientes delitos: (1) asesinato en primer grado, Artículo 93(a) del Código Penal de Puerto Rico de 2012, Ley Núm. 246-2012, 33 LPRA sec. 5142; (2) portación y uso de arma de fuego sin licencia, Artículo 5.04 de la Ley de Armas de Puerto Rico, Ley Núm. 404-2000, 25 LPRA sec. 458c;[14] (3) portación y uso de arma blanca, Artículo 5.05 de la Ley de Armas de Puerto Rico, supra, 25 LPRA sec. 458d, y (4) disparar o apuntar arma, Artículo 5.15 de la Ley de Armas de Puerto Rico, supra, 25 LPRA sec. 458n. En esencia, se le imputó que, actuando en concierto y mutuo acuerdo con su hermano, el Sr. José Resto Laureano (señor Resto Laureano), asesinó al Sr. Xavier García Batista (señor García Batista) mediante el uso de un arma de fuego y un taco de billar.

Ante tales acusaciones, se celebró un juicio conjunto en contra de los hermanos Resto Laureano. Durante la celebración del juicio por tribunal de derecho, el Ministerio Público presentó evidencia documental, testimonial e ilustrativa. En torno a la evidencia

---

[14]La Ley de Armas de Puerto Rico, Ley Núm. 404-2000, 25 LPRA sec. 455 et seq. fue derogada por la Ley de Armas de Puerto Rico de 2020, Ley Núm. 168-2019. En virtud de que los hechos ante nuestra consideración ocurrieron el 13 de octubre de 2014, no es de aplicación el nuevo estatuto.

documental, se presentó un informe médico-forense con los resultados de la autopsia realizada al señor García Batista, así como una certificación del estudio realizado al arma de fuego en controversia. En torno a la evidencia ilustrativa, el Ministerio Público presentó dos (2) videos que capturaron algunos de los eventos en controversia.[15]

Por último, el Ministerio Público presentó varios testimonios: la Sra. Tania Rodríguez (señora Rodríguez), pareja del occiso y única testigo presencial de los hechos, los agentes investigadores y, los peritos que realizaron el informe médico-forense y el análisis del arma.

A continuación, un desglose de la evidencia presentada en el juicio. La mayoría de la prueba pertinente en torno a lo que ocurrió propiamente el 13 de octubre de 2014, proviene del testimonio de la señora Rodríguez y de los videos.

---

[15]En primer lugar, se presentó una grabación obtenida de las cámaras de seguridad del negocio Beer Stop. Este video contiene distintas tomas de varios ángulos de las cámaras de seguridad del local. En segundo lugar, se presentó una grabación obtenida de la cámara de seguridad de un local de la empresa Claro, el cual estaba adyacente al negocio Beer Stop. Sin embargo, este segundo video consiste en una grabación tomada desde el celular de un Agente de la Policía de Puerto Rico, de la pantalla de la cámara de seguridad de Claro. Por tal razón, el video es de pobre calidad y no permite una apreciación certera de todos los eventos transcurridos. En el Tribunal de Primera Instancia, los abogados y las abogadas de los hermanos Resto Laureano impugnaron la falta de esfuerzos de parte del Ministerio Público para obtener la grabación emitida propiamente por la cámara de seguridad de Claro. Sin embargo, el peticionario no impugna la admisión de tal video en su recurso ante este Tribunal. Al contrario, el peticionario presentó tal video ante nos. A su vez, es menester destacar que ninguno de los dos (2) videos cuenta con el beneficio de audio.

**B.**

La señora Rodríguez, única testigo que estuvo presente en la noche de los hechos, tuvo una relación de pareja con el señor Resto Laureano, con quien procreó dos (2) hijos. Luego de culminar tal relación, la señora Rodríguez comenzó una relación sentimental con el occiso, el señor García Batista.[16]

En torno a la noche en controversia, el 13 de octubre de 2014, la señora Rodríguez y el señor García Batista visitaron un negocio llamado Beer Stop en el Municipio de Manatí entre las 8:00pm a 9:00pm.[17] La pareja llegó en un vehículo marca Nissan, modelo Frontier, color blanco.[18] El negocio Beer Stop tenía en la parte frontal una terraza al aire libre, en la cual se encontraba una mesa de billar.[19] Posterior a la terraza, había una puerta que daba paso al área de una barra.[20]

Posteriormente, los hermanos Resto Laureano, junto a sus respectivas parejas, llegaron a Beer Stop en un vehículo marca Toyota, modelo Tacoma, color gris.[21] Éstos procedieron a bajarse del vehículo y a caminar en dirección hacia el negocio, mientras que sus respectivas parejas permanecieron

---

[16]Transcripción de prueba oral, págs. 157-159.
[17]Íd., pág. 152.
[18]Íd., pág. 151.
[19]Véase, en general, Cámaras de seguridad #5, #9, #10, #12 y #16 de Beer Stop.
[20]Íd.
[21]Transcripción de prueba oral, pág. 153; Cámara de seguridad #9 de Beer Stop, 10:07:55pm-10:09:00pm.

en el automóvil. El señor Resto Laureano entró al área de la barra propiamente.[22] Por otro lado, el peticionario permaneció afuera del negocio dialogando con otras personas que estaban en un vehículo.[23]

Al entrar al área de la barra, el señor Resto Laureano se encontró directamente con el señor García Batista, quien estaba parado justo al frente de la puerta.[24] Inmediatamente, el señor Resto Laureano comenzó a dirigirse agresivamente hacia el señor García Batista y se generó una discusión entre ellos. Durante este breve intercambio, el señor Resto Laureano golpeó al señor García Batista en el rostro.[25]

Ante tal evento, el peticionario, quien se encontraba en las afueras del negocio, caminó hacia el área de la barra.[26] La señora Rodríguez expresó que, al ver al peticionario caminar hacia adentro del negocio, ella procedió a entrar igualmente.[27] Así, la señora Rodríguez se dirigió hacia el señor Resto Laureano y comenzó a discutir con él.[28] Mientras esto ocurría, la señora Rodríguez indicó

---

[22]Cámara de seguridad #9 de Beer Stop, 10:09:01pm-10:09:16pm.

[23]Íd.

[24]Cámara de seguridad #5 de Beer Stop, 10:09:07pm-10:09:23pm; Cámara de seguridad #10 de Beer Stop, 10:09:09pm-10:09:23pm.

[25]Íd.

[26]Cámara de seguridad #9 de Beer Stop, 10:09:24pm-10:09:28pm.

[27]Transcripción de prueba oral, págs. 152-153; Cámara de seguridad #16 de Beer Stop, 10:08:15pm.

[28]Cámara de seguridad #5 de Beer Stop, 10:09:27pm-10:09:30pm; Cámara de seguridad #10 de Beer Stop, 10:09:30pm-10:09:40pm.

que escuchó al peticionario expresarle al señor García Batista lo siguiente: "te vas a joder".[29]

Al intervenir la señora Rodríguez, el señor García Batista la agarró por el brazo e insistió que se fueran del lugar.[30] En el contrainterrogatorio, la señora Rodríguez admitió que, previo a salir, ella le indicó a su expareja, al señor Resto Laureano, lo siguiente: "tu mama bicho le diste al mío, yo le voy a dar a la tuya".[31] Acto seguido, todos salieron del área de la barra.[32]

El señor García Batista y la señora Rodríguez salieron juntos en dirección a un negocio adyacente al Beer Stop, un local de la empresa Claro, donde se encontraban estacionados los vehículos de todas las partes.[33] El señor Resto Laureano caminaba detrás de la señora Rodríguez y del señor García Batista.[34] El peticionario salió, más no siguió a los demás, sino que se dirigió al área de la terraza.[35]

La señora Rodríguez testificó que, mientras caminaban, el señor García Batista la sujetaba firmemente, por lo que

---

[29]Transcripción de prueba oral, pág. 164.

[30]Transcripción de prueba oral, pág. 164; Cámara de seguridad #5 de Beer Stop, 10:09:37pm-10:09:45pm; Cámara de seguridad #10 de Beer Stop, 10:09:38pm-10:09:44pm.

[31]Transcripción de prueba oral, pág. 187.

[32]Cámara de seguridad #5 de Beer Stop, 10:09:37pm-10:09:54pm.

[33]Cámara de seguridad #9 de Beer Stop, 10:09:49pm-10:10:03pm.

[34]Íd.

[35]Cámara de seguridad #5 de Beer Stop, 10:09:44pm-10:09:54pm. Cámara de seguridad #16 de Beer Stop, 10:09:53pm-10:09:56pm.

pudo sentir que éste portaba un arma de fuego.[36] Rápidamente, la señora Rodríguez logró soltarse del señor García Batista y relató que corrió hacia el vehículo modelo Tacoma, donde estaban las parejas de los hermanos Resto Laureano.[37] Acto seguido, ésta procedió a dar puños y patadas a las puertas y cristales de ese automóvil.[38] En ese momento, el peticionario agarró un taco de billar de la terraza y se dirigió hacia los vehículos donde estaban los demás involucrados.[39]

Es menester destacar que los próximos eventos, que son los medulares para la controversia ante nos, ocurrieron en un lapso aproximado de veinte (20) segundos. Como agravante, la calidad del video que se presentó en evidencia para tales eventos es de pobre calidad visual.

El señor García Batista persiguió brevemente a la señora Rodríguez mientras ésta golpeaba el otro vehículo, más éste desistió, se volteó y se dirigió rápidamente hacia su automóvil, el vehículo modelo Frontier.[40] Específicamente, se dirigió hacia la puerta delantera del

---

[36]Transcripción de prueba oral, págs. 178, 191-192, 251. Inicialmente, la testigo omitió esta información ante agentes investigadores. Sin embargo, en la vista preliminar y en el juicio, la Sra. Tania Rodríguez sostuvo consistentemente que el señor García Batista portaba un arma de fuego la noche en controversia.

[37]Cámara de seguridad #9 de Beer Stop, 10:09:52pm-10:09:56pm

[38]Transcripción de prueba oral, pág. 164.

[39]Cámara de seguridad #16 de Beer Stop, 10:09:56pm-10:10:01pm.

[40]Grabación de cámara de seguridad de Claro, 0:00:20-0:00:25.

lado del conductor. En ese momento, el señor Resto Laureano se encontraba en la parte trasera del vehículo, mientras que el peticionario se encontraba más cerca del señor García Batista, agarrando un taco de billar.[41]

Mientras el señor García Batista abría la puerta delantera del lado del conductor de su vehículo, el señor Resto Laureano le disparó.[42] Al escuchar las detonaciones, la señora Rodríguez se volteó en dirección al señor García Batista.[43] Al así hacerlo, testificó que vio al señor García Batista caer al piso con un arma de fuego en la mano.[44] No obstante, indicó que desconocía que ocurrió con esa arma luego del incidente. Las autoridades nunca recuperaron esa arma de fuego.

Inmediatamente luego de los disparos, el peticionario le dio dos (2) veces con el taco de billar al señor García Batista, quien aún continuaba con vida.[45] A raíz de tales acciones, el taco de billar se rompió en dos (2) pedazos.[46] Ante ello, la señora Rodríguez intervino y trató de defender al señor García Batista, pero el peticionario la empujó al piso.[47] La señora Rodríguez explicó que, ante un "forcejeo"

---

[41]Íd.
[42]Grabación de cámara de seguridad de Claro, 0:00:25-0:00:28.
[43]Transcripción de prueba oral, pág. 189; Grabación de cámara de seguridad de Claro, 0:00:25-0:00:31.
[44]Transcripción de prueba oral, pág. 189.
[45]Grabación de cámara de seguridad de Claro, 0:00:29-0:00:34.
[46]Transcripción de prueba oral, pág. 189.
[47]Transcripción de prueba oral, pág. 166; Grabación de cámara de seguridad de Claro, 0:00:39-0:00:56.

entre el señor García Batista y el peticionario, ella cogió la parte más ancha del taco de billar y procedió a golpear al peticionario.[48] Lo anterior, mientras que alegadamente el peticionario continuaba golpeando al señor García Batista con la parte más estrecha del taco de billar.[49] Luego de alrededor de veinte (20) segundos, los videos presentados muestran a los hermanos Resto Laureano retirándose del lugar.[50]

El Agente Pedro Rolón Ortiz (agente Rolón Ortiz) de la Policía de Puerto Rico, fue el primero en llegar a la escena.[51] Allí se encontró con el señor García Batista, localizado en el pavimento de la acera, herido por impactos de bala.[52] En ese momento, indicó que éste estaba vivo y que se quejaba por el dolor.[53] De igual modo, testificó que se encontró con la señora Rodríguez llorando y gritando.[54] Inmediatamente, el agente Rolón Ortiz contactó al retén para que se enviara una ambulancia.[55] El señor García Batista falleció en el trayecto hacia el hospital.[56]

Según el Dr. Javier Serrano, quien realizó el informe médico-forense, el señor García Batista **murió a causa de las**

---

[48]Transcripción de prueba oral, págs. 166-167, 189; Grabación de cámara de seguridad de Claro, 0:00:34-0:00:56.
[49]Transcripción de prueba oral, pág. 189.
[50]Grabación de cámara de seguridad de Claro, 0:00:34-0:00:56.
[51]Transcripción de prueba oral, págs. 10-11.
[52]Íd., pág. 11.
[53]Íd.
[54]Íd.
[55]Íd.
[56]Íd., pág. 324.

**heridas de bala.**[57] De igual modo, especificó que, aparte de las heridas causadas por las municiones, **el señor García Batista no tenía ningún otro tipo de impacto o evidencia de daño corporal.**[58]

A raíz de estos hechos, se emitieron órdenes de arresto en contra de los hermanos Resto Laureano. El Agente Radamés Miranda Pérez (agente Miranda Pérez) de la Policía de Puerto Rico, encargado de arrestar al peticionario, testificó en torno a varios intercambios que tuvo con éste. Particularmente, el agente Miranda Pérez relató que el peticionario no resistió su arresto y que, al confrontarlo con la alegada arma de fuego utilizada por su hermano, el peticionario espontáneamente le expresó que sólo se defendió porque la víctima tenía un arma.[59]

Por otro lado, el Agente Carlos Cruz Román (agente Cruz Román), oficial de la Policía de Puerto Rico adscrito a la División de Homicidios de Arecibo, estuvo encargado de investigar el caso ante nuestra consideración.[60] Para ello, el agente Cruz Román entrevistó a diversos testigos en la escena y a los agentes de la Policía de Puerto Rico que intervinieron con los acusados. Además, examinó los estudios

---

[57]Transcripción de prueba oral, pág. 325; Informe médico-forense, PAT-4490-14, Apéndice de certiorari, pág. 26.

[58]Transcripción de prueba oral, pág. 329; Informe médico-forense, PAT-4490-14, Apéndice de certiorari, pág. 22.

[59]Transcripción de prueba oral, págs. 55-57.

[60]Íd., págs. 205-206.

periciales y estudió los videos de las cámaras de seguridad.[61]

A esos efectos, el agente Cruz Román testificó que al observar los videos, percibió que, en efecto, el señor García Batista tenía un arma la noche en controversia.[62] Ello, pues el señor García Batista caminaba con su brazo y mano derecha pegada a la cintura de su pantalón.[63] De igual modo, el agente Cruz Román testificó que **de su investigación no surgió evidencia que probara que el peticionario: participó intencionalmente de una planificación premeditada para causarle la muerte al señor García Batista; que tuviera conocimiento de que su hermano estaba portando un arma; que le facilitara el arma al señor Resto Laureano; ni tuviera control o posesión alguna sobre el arma que portaba éste.[64]**

### C.

Eventualmente, el Tribunal de Primera Instancia declaró culpable al peticionario de todos los delitos imputados, entiéndase, por: (1) asesinato en primer grado; (2) portación y uso de arma de fuego sin licencia; (3) portación y uso de arma blanca, y (4) disparar o apuntar armas. Debido a lo anterior, le condenó a cumplir consecutivamente una pena de ciento treinta (130) años en prisión.

---

[61]Íd., págs. 284-286.
[62]Íd., pág. 251.
[63]Grabación de cámara de seguridad de Claro, 0:00:20-0:00:25.
[64]Transcripción de prueba oral, pág. 286.

Insatisfecho, el peticionario presentó una moción de reconsideración ante el foro primario. En síntesis, impugnó la convicción por los delitos de asesinato en primer grado, de portación de armas y de disparo de armas. Así, arguyó que el Ministerio Público no probó, más allá de duda razonable, que actuó con intención de asesinar al señor García Batista, ni que participara en la portación y uso del arma de fuego que utilizó su hermano. De igual modo, alegó que no se probó que hubiese un plan acordado para quitarle la vida al señor García Batista. No obstante, no impugnó la imputación del delito de portación y uso de arma blanca al reconocer que, en efecto, agredió al señor García Batista con el taco de billar. El foro primario declaró <u>no ha lugar</u> a la moción de reconsideración.

Inconforme, el peticionario acudió al Tribunal de Apelaciones mediante un recurso de apelación. En el mismo, impugnó nuevamente los delitos de asesinato en primer grado, de portación de arma y de disparo de arma. Así, expresó que el mero hecho de que estuvo presente en el momento de los hechos no significaba que tenía conocimiento de que su hermano tenía la intención de quitarle la vida al señor García Batista. Al contrario, alegó que la evidencia presentada demostró que, al llegar al negocio, no participó de la discusión entre su hermano y la víctima. Además, destacó que al salir del negocio tomó una ruta distinta a los demás. Asimismo, arguyó que los eventos ocurrieron en

un lapso de segundos por lo que no hubo tiempo para planificar crimen alguno junto a su hermano.

Por otro lado, el peticionario añadió que el señor García Batista portaba un arma, por lo que actuó en defensa propia al golpearle con el taco de billar. A esos efectos, enfatizó que no agredió al señor García Batista con intención de asesinarle y que así quedó evidenciado en los resultados de la autopsia.

Por último, resaltó que el agente Cruz Román, encargado de la investigación del caso, testificó que no se encontró evidencia alguna que probara que él planificó cometer el delito de asesinato ni que tuvo conocimiento, control o posesión del arma de fuego. A la luz de lo anterior, sostuvo que el Ministerio Público no satisfizo el quantum de prueba exigible constitucionalmente para rebatir su presunción de inocencia.

Por su parte, la Oficina del Procurador General presentó un alegato en el cual adujo que el foro primario actuó correctamente. Así, alegó que de la prueba presentada surgía que el peticionario actuó en mutuo acuerdo con su hermano para asesinar al señor García Batista. Particularmente, resaltó que la intención del peticionario se podía apreciar en los videos, en los cuales alegadamente surgía que éste esperó hasta que el señor Resto Laureano disparara para él proceder a golpear a la víctima.

Además, argumentó que el señor García Batista no podía portar un arma debido a que esa noche tenía unos pantalones de algodón, los cuales presuntamente se le hubiesen caído de tener un objeto en la cintura. Asimismo, alegó que el peticionario poseyó constructivamente el arma de fuego, entiéndase, que tuvo conocimiento, control y manejo del bien delictivo.

El señor Resto Laureano, hermano del aquí peticionario, también presentó un recurso de apelación, por lo que el Tribunal de Apelaciones consolidó ambos recursos. Ante este cuadro, el Tribunal de Apelaciones confirmó el dictamen del Tribunal de Primera Instancia. En torno al peticionario, el foro apelativo determinó que la prueba demostró que éste actuó en mutuo acuerdo con su hermano para asesinar al señor García Batista con un arma de fuego.

Para apoyar tal conclusión, el Tribunal de Apelaciones se basó en los siguientes hechos particulares: (1) que la señora Rodríguez testificó que, previo a salir del negocio Beer Stop, escuchó al peticionario comunicarle al señor García Batista "te vas a joder"; y (2) que, alegadamente, los videos muestran que el peticionario señaló hacia el señor García Batista, previo a que el señor Resto Laureano le disparara. Según el foro apelativo, éste último hecho reflejó que el peticionario "le dio cobertura" a su hermano para que éste disparara. Asimismo, concluyó que el señor García Batista no podía portar un arma en la noche de los

hechos debido a que su pantalón era de algodón. El peticionario presentó una moción de reconsideración, a la cual el Tribunal de Apelaciones declaró no ha lugar.

Insatisfecho, el peticionario comparece ante nos mediante un recurso de certiorari. En el mismo, reitera que no puede considerársele autor de los delitos imputados, pues no se probó que éste conspiró ni que contribuyó a los mismos. Para apoyar tal contención, enfatiza que, tal como dispone la autopsia, no le generó daño corporal alguno al señor García Batista.

Asimismo, impugna que el Tribunal de Apelaciones haya fundamentado su convicción en las palabras que alegadamente le expresó al señor García Batista previo a salir del negocio. Así, arguye que los videos demuestran que actuó espontáneamente y en reacción a los eventos que estaban ocurriendo. Particularmente, insiste que actuó en respuesta al hecho de que el señor García Batista portaba un arma.

En virtud de lo anterior, el peticionario alega que los foros judiciales basaron su convicción en especulaciones que no tienen base en la prueba presentada por el Ministerio Público. En consecuencia, solicita que revoquemos los dictámenes de los foros recurridos.

Por su parte, la Oficina del Procurador General presentó un alegato en el cual arguye que el peticionario actuó en acuerdo común con su hermano para quitarle la vida al señor García Batista. Particularmente, reitera que sus expresiones

hacia la víctima y el hecho de que lo golpeara una vez fue herido de bala, evidencian su participación como coautor de los delitos imputados. A raíz de ello, aduce que este Tribunal debe dar deferencia a la apreciación de la prueba que ejerció el foro primario.

El 15 de marzo de 2019, este Tribunal proveyó no ha lugar al recurso ante nuestra consideración. El peticionario presentó oportunamente una moción de reconsideración en la que reiteró los argumentos antes explicados. Así, el 31 de mayo de 2019, el Pleno de este Tribunal acordó expedir el recurso en reconsideración. No obstante, no se logró un consenso mayoritario, por lo que se procedió a confirmar el dictamen del Tribunal de Apelaciones. Este último resultado es el que provoca mi disenso, pues la sentencia del Tribunal de Apelaciones, bajo mi criterio, es errónea.

A continuación, el derecho y los fundamentos en los que se basa la disidencia.

## II

### A.

La Constitución de Puerto Rico provee una serie de garantías para toda persona acusada de delito. Entre éstas, se encuentran los principios de la presunción de inocencia y el debido proceso de ley. Art. II, Secs. 7 y 11, Const. PR, LPRA, Tomo 1. En virtud de estas protecciones, nuestro ordenamiento exige que la culpabilidad de una persona acusada se pruebe más allá de duda razonable. Pueblo v.

Robles González, 125 DPR 750, 756 (1990). Así, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, dispone que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá".

A raíz de ello, el Ministerio Público tiene el peso de la prueba durante todas las etapas del juicio a nivel de instancia. Pueblo v. Irizarry, 156 DPR 780, 787 (2002). En tal encomienda, el Estado debe probar, más allá de duda razonable, lo siguiente: (1) cada uno de los elementos del delito, y (2) su conexión con la persona acusada. Pueblo v. Acevedo Estrada, 150 DPR 84, 99 (2000). Este segundo criterio es fundamental, pues "[p]uede haber prueba más allá de duda razonable sobre que se cometió un asesinato u homicidio ... sin embargo, quedar duda razonable en torno a si el acusado fue autor o coautor del delito, lo que acarrea su absolución". E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1991, T. I, Sec. 5.1, pág. 217. Por consiguiente, sólo si se prueban ambos elementos más allá de duda razonable, se podrá dictar un fallo de culpabilidad que derrote la presunción de inocencia que cobija a toda persona acusada de delito.

Al aquilatar y sopesar la prueba presentada, el foro judicial debe cerciorarse de que la misma sea "suficiente y satisfactoria; es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o

en un ánimo no prevenido". Pueblo v. Maisonave Rodríguez, 129 DPR 49, 65 (1991). En ese ejercicio valorativo, los tribunales podrán encontrarse con evidencia conflictiva, más es la función del juzgador dirimir la credibilidad de los testimonios que observó y escuchó. Pueblo v. Bonilla Ortiz, 123 DPR 434, 442 (1989). Es por ello, que hemos afirmado que no procede rechazar toda la declaración de un testigo porque se haya contradicho o faltado a la verdad respecto a uno o más particulares. Pueblo v. Chévere Heredia, 139 DPR 1, 15-16 (1995). En ese sentido, "es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a la prueba en su totalidad". Pueblo v. Rodríguez Román, 128 DPR 121, 129 (1991).

Una vez presentada la totalidad de la prueba, el foro primario deberá determinar si se probó, más allá de duda razonable, la culpabilidad de la persona acusada de delito. Por tanto, si la prueba presentada genera duda razonable, entiéndase, "duda fundada que surge como producto del raciocinio de todos los elementos de juicio involucrados en el caso", se debe absolver a la persona acusada. Pueblo v. Irizarry, supra, pág. 788. Claro está, no se requiere establecer la culpabilidad de una persona con certeza matemática. Pueblo v. Maisonave Rodríguez, supra, pág. 71. Sin embargo, si un estudio justo e imparcial de la totalidad de la evidencia causa insatisfacción en la conciencia del

juzgador, existe duda razonable. <u>Pueblo v. Irizarry</u>, supra; <u>Pueblo v. Acevedo Estrada</u>, supra, pág. 100.

Ahora bien, la apreciación de la prueba presentada en juicio es un asunto combinado de hecho y de derecho.[65] Por tal razón, la determinación de culpabilidad a nivel de foro de primera instancia es revisable por los tribunales apelativos. <u>Pueblo v. Cabán Torres</u>, 117 DPR 645, 653 (1986). No obstante, en ese ejercicio, concedemos deferencia a la apreciación y al valor que le otorgó el juzgador de primera instancia a la prueba desfilada. Íd., pág. 654. Lo anterior, pues es el foro primario el que tiene la oportunidad de observar directamente la prueba y de escuchar a los y las testigos. En consecuencia, "las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente ni tampoco deben sustituirse por el criterio del foro apelativo, **a menos que de la prueba administrada surja que no existe base suficiente que apoye tal determinación**". (Énfasis suplido). <u>Pueblo v. Acevedo Estrada</u>, supra, pág. 99.

Por tanto, tal deferencia a los foros primarios no es absoluta. Al contrario, los tribunales apelativos deben estudiar sopesada y cuidadosamente la totalidad de la prueba presentada, en aras de garantizar que no se vulnere el

---

[65]Así lo hemos reconocido, pues "[l]as pruebas son hechos pero su análisis pone en movimiento, además de la experiencia del juzgador, su conocimiento del Derecho para así llegar a una solución justa de la controversia". <u>Pueblo v. Carrasquillo Carrasquillo</u>, 102 DPR 545, 552 (1974).

derecho constitucional de toda persona acusada de delito de que su culpabilidad se establezca más allá de duda razonable. Íd., pág. 98. Es nuestra responsabilidad darnos a la tarea, pues "[h]asta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila". Pueblo v. Carrasquillo Carrasquillo, 102 DPR 545, 551-552 (1974).

A la luz de lo anterior, "hemos revocado sentencias en las cuales las determinaciones de hecho, aunque sostenidas por la prueba desfilada, no establecen la culpabilidad del acusado más allá de duda razonable." Pueblo v. Acevedo Estrada, supra, págs. 100-101. Es por ello que "[n]o hemos vacilado en dejar sin efecto un fallo inculpatorio cuando el resultado de ese análisis 'nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado'". Pueblo v. Irizarry, supra, pág. 789 (citando a Pueblo v. Carrasquillo Carrasquillo, supra, pág. 551).

**B.**

Como es conocido, el Código Penal de Puerto Rico ha sido enmendado y alterado frecuentemente en las últimas décadas. A raíz de ello, la conceptualización y la aplicación de múltiples figuras del andamiaje penal han variado significativamente en nuestro ordenamiento. Por

tanto, para una comprensión cabal de la normativa vigente en torno a la autoría y a la participación criminal, es necesario recapitular como se han desarrollado tales figuras en Puerto Rico.

Inicialmente, desde el Código Penal de Puerto Rico de 1902, Ley de 1 de marzo de 1902, 33 LPRA sec. 81 et seq., en Puerto Rico imperó la teoría de la equivalencia proveniente del derecho anglosajón. D. Nevares-Muñiz, Derecho Penal puertorriqueño: Parte general, 7ma ed., San Juan, Ed. Inst. para el Desarrollo del Derecho, 2015, págs. 351-352. En esencia, ello significaba que toda persona que intervenía en la comisión de un delito, independientemente de la gravedad de su contribución, se le responsabilizaba penalmente de la misma manera que al autor o autora del acto delictivo.

Según esta teoría, también conocida como el concepto unitario de autor o autora, no se distingue entre autoría y otras modalidades de participación, "sino que todo sujeto que interviene en un hecho debe ser considerado autor del mismo". S. Mir Puig, Derecho Penal: Parte general, 8va ed., Barcelona, Ed. Reppertor, 2008, pág. 370. La teoría de equivalencia ha sido definida como "uno de los mayores desaciertos de la vieja legislación punitiva". (Citas omitidas). Pueblo v. Sustache Sustache, 176 DPR 250, 298-299 (2009). Ello, pues el andamiaje criminal castigaba igualmente tanto el comportamiento de los autores y las

autoras del delito, como el de las personas que participaban en calidad de cooperadoras o inductoras. L.E. Chiesa Aponte, Derecho Penal Sustantivo, Estados Unidos, Pubs. JTS, 2007, pág. 184.

Esta doctrina fue reiterada en el Código Penal de Puerto Rico de 1974, Ley Núm. 115 de 22 de julio de 1974, 33 LPRA sec. 3001 et seq. Allí se consideraba autor o autora de delito a toda persona que participaba directamente en la comisión de un delito, que ayudara a otra persona a ejecutar el delito, e incluso, a "los que cooperaren de cualquier otro modo en la comisión del delito". 33 LPRA sec. 3172.

Sin embargo, posteriormente, el Código Penal de Puerto Rico de 2004, Ley Núm. 149-2004, 33 LPRA sec. 4629 et seq., introdujo a nuestro ordenamiento la teoría de diferenciación proveniente del derecho civil. Esta tendencia teórica tiene como propósito distinguir entre las distintas personas que aportan activamente a la comisión de un delito. Pueblo v. Sustache Sustache, supra, pág. 296. De este modo, se clasifican a las personas como autores o partícipes dependiendo de la gravedad y la magnitud de su contribución al delito. Íd. Así, las personas responden criminalmente según su grado de participación en el hecho punible. Nevares-Muñiz, Derecho Penal puertorriqueño: Parte general, op. cit., pág. 352.

No obstante, en el año 2012, la Asamblea Legislativa aprobó un nuevo código, el Código Penal de Puerto Rico de

2012, Ley Núm. 146-2012, 33 LPRA sec. 5001 et seq. (enmendado 2014), el cual nuevamente acudió e implantó la teoría de la equivalencia. Nevares-Muñiz, Derecho Penal puertorriqueño: Parte general, op. cit., pág. 353. Mediante el mismo, se estableció una sola categoría de participación criminal en la cual se castigaba como autor o autora a **toda** persona que participara en la comisión de un delito, incluyendo al cooperador o cooperadora. 33 LPRA sec. 5067 (enmendado 2014).

Finalmente, mediante la Ley Núm. 246-2014, la Asamblea Legislativa enmendó nuevamente el Código Penal de 2012 para, entre otros asuntos, reestablecer la teoría de diferenciación adoptada en el año 2004. Nevares-Muñiz, Derecho Penal puertorriqueño: Parte general, op. cit., pág. 353. Por tanto, actualmente, nuestro ordenamiento contempla una distinción entre la responsabilidad penal de un autor o autora y la de otros tipos de partícipes.

A la luz de estos cambios en nuestro ordenamiento jurídico penal, procedo a exponer la normativa aplicable a las figuras de autoría y cooperación. Resulta pertinente destacar que los hechos por los cuales se le acusó al peticionario ocurrieron el 13 de octubre de 2014. Por tanto, al momento de los hechos, estaba vigente el Código Penal de 2012, previo a las enmiendas del año 2014 en adelante.

**i.**

El Art. 44 del Código Penal de 2012 proveía que se considerarían autores y autoras las siguientes personas:

(a)  Los que toman parte directa en la comisión del delito.

(b)  Los que solicitan, fuerzan, provocan, instigan o inducen a otra persona a cometer el delito.

(c)  Los que se valen de una persona inimputable para cometer el delito.

(d)  **Los que cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo.**

(e)  Los que se valen de una persona jurídica para cometer el delito.

(f)  Los que actúen en representación de otro o como miembro, director, agente o propietario de una persona jurídica, siempre que haya una ley que tipifique el delito y realicen la conducta delictiva, aunque los elementos especiales que fundamentan el delito no concurran en él pero sí en el representado o en la persona jurídica.

(g)  Los que teniendo el deber de garante sobre un bien jurídico protegido, conociendo el riesgo de la producción de un resultado delictivo por ellos no provocado que lo pone en peligro, no actúen para evitarlo.

(h)  **Los que cooperan de cualquier otro modo en la comisión del delito.** (Énfasis suplido). 33 LPRA sec. 5067 (enmendado 2014).[66]

En términos generales, este Tribunal ha determinado que, para que una persona sea responsabilizada criminalmente

---

[66]Los incisos (a) al (f) del Art. 44 aún tienen vigencia en nuestro ordenamiento jurídico. En torno al inciso (d), que es uno de los más discutidos en esta Opinión disidente, actualmente provee que se considerarán autores: "[l]os que a propósito o con conocimiento cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, que contribuyen significativamente a la consumación del hecho delictivo". 33 LPRA sec. 5067. Por otro lado, el inciso (h) fue posteriormente eliminado y se penalizó tal conducta como cooperación. 33 LPRA sec. 5068. Abundaremos igualmente sobre el inciso (h) más adelante.

en calidad de autor o autora, ésta debió tener el **dominio del hecho delictivo**. Pueblo v. Sustache Sustache, supra, págs. 301-302. Conforme a tratadistas del Derecho Penal, el dominio del hecho significa que se considerará un autor o autora a "quien domina finalmente la realización del delito, es decir, quien decide en líneas generales el **sí** y el **cómo** de su realización". (Énfasis suplido). F. Muñoz Conde y M. García Arán, Derecho Penal: Parte general, 8va ed. rev., Valencia, Ed. Tirant Lo Blanch, 2010, pág. 434. En ese sentido, el autor o la autora "tiene el dominio final del suceso", cuando éste decide cuándo y cómo se realiza el hecho delictivo. E. Bacigalupo, Manual de Derecho Penal, 3ra ed., Bogotá, Ed. Temis S.A., 1996, pág. 182. "Para esta imputación lo decisivo es que pueda afirmarse que el delito **pertenece** al sujeto como **suyo**". (Énfasis en el original). Mir Puig, op. cit., pág. 376. Los autores y las autoras, independientemente de que se trate de autoría directa, mediata o coautoría, tienen el dominio del hecho. L.E. Chiesa Aponte, Autores y cooperadores, 79 Rev. Jur. UPR 1163, 1165 (2010).

Como puede apreciarse, el Art. 44 preceptúa distintas modalidades de autoría. En primer lugar, se encuentra la autoría directa, la cual se materializa en una persona que interviene personal y directamente en la comisión del delito. El Art. 44 en su inciso (a) codifica la conducta de un autor o una autora directa. En segundo lugar, la modalidad

de autoría mediata ocurre cuando una persona utiliza a otra persona "como instrumento" para que se ejecute el delito. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 178. Los incisos (b) y (c) del Art. 44 recogen instancias de autoría mediata.

En tercer lugar, existe la modalidad de coautoría. La coautoría se puede manifestar de distintas maneras. Por ejemplo, en virtud del Art. 44(a), dos o más personas que contribuyan directa y personalmente a la comisión de un delito se considerarán coautores. Chiesa Aponte, Autores y cooperadores, supra, pág. 1166. Sin embargo, "no toda coautoría supone que cada uno de los interventores contribuya **directamente** a la comisión del delito mediante la realización de uno de los actos descritos en el tipo delictivo". (Énfasis en el original). Íd. Es decir, una persona puede contribuir de manera tan significativa a un hecho punible que, aunque no aporte directamente, su conducta amerita que se le responsabilice como coautor o coautora. Un ejemplo de lo anterior está codificado en el Art. 44(d), el cual disponía que se considerará coautor o coautora a los que "cooperan con actos anteriores, simultáneos o posteriores a la comisión del delito, **sin cuya participación no hubiera podido realizarse el hecho delictivo**". (Énfasis suplido). 33 LPRA sec. 5067 (enmendado 2014).

En torno a lo anterior, hemos resuelto que, para que la persona se considere coautor o coautora de un delito según el Art. 44(d), se deben cumplir dos requisitos esenciales: (1) un **acuerdo mutuo** entre las distintas personas involucradas para cometer el delito, y (2) una **contribución esencial o significativa** a la consumación del hecho delictivo. Pueblo v. Sustache Sustache, supra, pág. 302; Chiesa Aponte, Derecho Penal Sustantivo, op. cit., págs. 178-179. El primer requisito es conocido como el elemento subjetivo de la coautoría, mientras que el segundo se trata del elemento objetivo. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 179.

En relación con el requisito de un acuerdo previo y mutuo, se ha dispuesto lo siguiente:

> Es importante señalar que la coautoría **solamente concurre** cuando existe un **acuerdo previo** mediante el cual los interventores se "inscriben conscientemente en [un] plan conjunto" cuya meta es la consumación de un hecho delictivo. Se trata de un requisito **esencial** de la coautoría que surge implícitamente de la doctrina. **El acuerdo previo es esencial, puesto que se entiende que solamente puede imputarse a cada uno de los interventores los actos del resto de los interventores cuando éstos han acordado previamente cometer el delito.** De ahí que sólo cabe afirmar una coautoría punible bajo el Art. 43(d) cuando existe un acuerdo previo de **distribución de funciones** que hace posible imputar los actos de uno de los interventores a los demás y viceversa. (Citas omitidas). (Énfasis suplido). Chiesa Aponte, Autores y cooperadores, supra, pág. 1168.

En ese sentido, la persona que actúa como coautor o coautora de un delito tiene que participar intencionalmente de la comisión del delito. Es decir, "se necesita establecer

algún grado de consejo, incitación o participación directa o indirecta en el hecho punible". Pueblo v. Sustache Sustache, supra, pág. 301. Es por ello que "[a] los fines de imputar responsabilidad a título de autor **no basta una mera cooperación** sino que es necesario establecer una **planificación previa** o participación intencional de parte de cada uno de los copartícipes en la actividad delictiva". (Énfasis suplido). Nevares-Muñiz, Derecho Penal puertorriqueño: Parte general, op. cit., pág. 360. De lo contrario, "[l]a ausencia de acuerdo común, tanto para nuestra legislación como también para la mayoría de la doctrina universal, no permite el tratamiento como coautores de los distintos individuos que intervienen". A. Hernández Esquivel, La coautoría, 25 Derecho Penal y Criminología 97, 101 (2004).

Por otro lado, la coautoría exige actos esenciales que contribuyan a la producción de la ofensa. Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 179. En ese sentido, una persona se considera coautor o coautora cuando "su retirada impediría la ejecución del delito"; es decir "[s]u participación es **necesaria e imprescindible** para la ejecución del delito". D. Nevares-Muñiz, Código Penal de Puerto Rico, Ed. 2012, San Juan, Ed. Inst. para el Desarrollo del Derecho, pág. 86. Por tanto, se considerará coautor o coautora aquella persona que "contribuya de algún modo en la realización del delito (no necesariamente con actos

ejecutivos), de tal modo que dicha contribución pueda estimarse como un eslabón importante de todo el acontecer delictivo". Muñoz Conde y García Arán, op. cit., pág. 437.

Es menester tener presente que la determinación de lo que constituye una aportación esencial a fines de coautoría conlleva un análisis particularizado de cada caso. Íd. Es decir, requiere un ejercicio de consideraciones e interpretaciones valorativas de las circunstancias de cada controversia. M. Díaz y García Conlledo, La autoría en Derecho Penal: Caracterización general y especial atención al Código Penal Colombiano, 25 Derecho Penal y Criminología 33, 58 (2004).

En consecuencia, si se cumplen estos dos (2) requisitos, se castigaría a la persona en calidad de coautor o coautora por contribuir significativamente, más no directamente, a la comisión de un delito. Chiesa Aponte, Autores y cooperadores, supra, pág. 1171. De modo que, la mera presencia de una persona durante la comisión de un delito no basta para imponer responsabilidad penal. Pueblo v. Agosto Castro, 102 DPR 441, 444-445 (1974).

En Pueblo v. Santiago et al., 176 DPR 133 (2009), por ejemplo, este Tribunal le impuso responsabilidad penal a un individuo en calidad de coautor que, aunque no intervino directa y personalmente en la comisión de los delitos, sí participó de una planificación previa y aportó elementos esenciales e indispensables en pro de la ejecución de los

mismos. Veamos brevemente la controversia que en aquel momento ocupó a este Tribunal.

En esa ocasión, se generó una discusión entre varios individuos en un complejo de vivienda, incluyendo al Sr. Christopher Santiago Rivera (señor Santiago Rivera), el Sr. Luis Santiago Collazo (señor Santiago Collazo) y su hermano, el Sr. Ángel L. Santiago Collazo (acusado). Íd., págs. 136-137. A raíz de ese evento, el señor Santiago Collazo se retiró del lugar junto a otro individuo, más unos minutos después el acusado se dirigió en la misma dirección que sus compañeros. Íd., pág. 137. Todos entraron a uno de los edificios del complejo.

En ese momento, el acusado fue a buscar un arma que le pertenecía que la había dejado bajo el cuidado de un vecino. Íd., pág. 139. Al salir los tres (3) individuos del edificio, el acusado le entregó el arma de fuego al señor Santiago Collazo. Íd., pág. 137. Con el beneficio de tal arma, los hermanos regresaron al lugar donde se generó la discusión y, el señor Santiago Collazo disparó y le quitó la vida al señor Santiago Rivera. Íd., pág. 137. Mientras ello ocurría, se probó que el acusado se colocó en la salida del lugar para obstruir el paso. Íd.

Como puede apreciarse, en ese caso, el Ministerio Público probó, más allá de duda razonable, que el acusado planificó previamente la comisión del delito de asesinato junto a su hermano y que estaba en pleno conocimiento de que

su hermano estaba portando un arma con esos propósitos. A esos efectos, los hermanos se retiraron de una discusión con el único propósito de buscar un arma de fuego, la cual precisamente le pertenecía al acusado. De este modo, se probó que el acusado hizo una contribución esencial e indispensable para la comisión del delito, sin cuya participación el mismo no se hubiese podido ejecutar.

Aclarada la normativa aplicable a la figura de coautoría contenida en el inciso (d) del Art. 44 del Código Penal de 2012, corresponde explicar otro tipo de conducta codificado igualmente en tal inciso: la cooperación necesaria. Por otro lado, nos adentraremos en el inciso (h) del Art. 44, el cual codifica la cooperación no necesaria. Para abundar en lo anterior, se deben exponer las distintas modalidades de participación criminal que contempla nuestro ordenamiento jurídico.

**ii.**

Una persona se considerará partícipe en la comisión de un delito cuando "contribuye intencionalmente a un hecho antijurídico ajeno". Chiesa Aponte, _Autores y cooperadores_, _supra_, pág. 1169. En virtud de la teoría de diferenciación, el o la partícipe tiene una responsabilidad accesoria y subordinada al hecho delictivo cometido por el autor o la autora. Muñoz Conde y García Arán, _op. cit._, pág. 439. A diferencia de la persona que actúa como autora del delito,

el partícipe no tiene dominio del hecho. Bacigalupo, op. cit.

Existen dos (2) formas en las que una persona puede ser partícipe de un delito, a saber: mediante inducción o cooperación. Chiesa Aponte, Autores y cooperadores, supra. A su vez, la cooperación que puede brindar una persona en un contexto criminal puede ser catalogada de las siguientes maneras: (1) cooperación necesaria o (2) cooperación no necesaria. Íd. En Puerto Rico, al igual que en otras jurisdicciones, los inductores y los cooperadores necesarios, a pesar de que **no** son **conceptualmente** autores de delito, **sí** se les **castiga** como si fuesen autores. Es decir, se les impone la misma pena que les corresponde a los autores y las autoras de delito a pesar de que su conducta no cumple con los requisitos teóricos de autoría. Íd., págs. 1169-1170; Mir Puig, op. cit., pág. 401; J. L. Rodríguez-Villasante y Prieto, Los principios generales del Derecho Penal y la responsabilidad penal individual en el estatuto de Roma de la Corte Penal Internacional, 21 Derecho Penal y Criminología 13, 30 (1999). Lo anterior, pues se entiende que su aportación y participación en el crimen es de tal magnitud que se justifica que sea penalizado o castigado en calidad de autor o autora. Así, "[e]l que presta una 'ayuda necesaria' debe tratarse como un autor principal". H. Silving, Elementos constitutivos del delito, 1ra ed., San Juan, Editorial Universitaria, 1976, pág. 163. A raíz de la

magnitud de la contribución que realiza un cooperador o una cooperadora necesaria, la Asamblea Legislativa estima que se le debe castigar como un coautor o coautora.

A esos fines, el Art. 44(d), explicado anteriormente, no sólo codifica la conducta de la autoría, sino que además castiga la conducta de cooperación necesaria. Es decir, una persona que aporta "con actos anteriores, simultaneaos o posteriores a la comisión del delito, sin cuya participación no hubiera podido realizarse el hecho delictivo la persona" puede ser coautor o coautora de un delito o, cooperador o cooperadora necesaria. 33 LPRA sec. 5067 (enmendado 2014). La cooperación necesaria siempre ha sido penalizada como coautoría en todos los códigos penales puertorriqueños, por lo que no se vio alterada mediante la incorporación de la teoría de diferenciación a nuestro ordenamiento.

En términos generales, "es cooperador necesario quien contribuye a la comisión del delito mediante un acto **esencial** para su consumación". (Énfasis en el original). Chiesa Aponte, Autores y Cooperadores, supra, pág. 1172. Distinto al caso de coautoría, el cooperador o la cooperadora necesaria carece de un dominio del hecho, es decir, no tiene control sobre el sí y el cómo del acontecer delictivo Íd., págs. 1173-1174.

Sin embargo, el cooperador o la cooperadora necesaria sí realiza una contribución **esencial** al hecho punible a través de actos anteriores, simultáneos o posteriores a la

comisión del delito. Íd., pág. 1172. "[S]e trata de una contribución de especial importancia para la consecución de un fin delictivo". Chiesa Aponte, Derecho Penal Sustantivo, op. cit., pág. 183. A esos efectos, se considerará una cooperación necesaria cuando los actos sean tan esenciales y significativos que, sin ellos, "no hubiera podido realizarse el hecho delictivo". 33 LPRA sec. 5067 (enmendado 2014). Por tanto, "[s]e está ante un caso de cooperación necesaria cuando la ofensa no se hubiera podido llevar a cabo sin la contribución del cooperador". Chiesa Aponte, Derecho Penal Sustantivo, op. cit.

Por otro lado, una persona puede participar en la comisión de un delito mediante una cooperación no necesaria. En Puerto Rico, la figura de la cooperación no necesaria ha sufrido varios cambios. Inicialmente, el Código Penal de 1974 disponía que todas las personas que "cooperaren de cualquier otro modo en la comisión del delito" se consideraban autores o autoras del mismo. 33 LPRA sec. 3172. Lo anterior significaba que la persona que participara como cooperador o cooperadora no necesaria, por más mínima que fuese su aportación, se le imponía una pena de autor o autora.

Posteriormente, el Código Penal de 2004 incorporó por primera vez la figura del cooperador o cooperadora a nuestro ordenamiento. De ese modo, dispuso que "[s]e consideran cooperadores los que sin ser autores, con conocimiento,

cooperan de cualquier otro modo en la comisión del delito".
33 LPRA sec. 4671. Así, la persona que aportara a una conducta delictiva en calidad de cooperador o cooperadora no necesaria, se le impondría "una pena igual a la mitad de la pena señalada para el delito o su tentativa, según corresponda, hasta un máximo de diez (10) años". 33 LPRA sec. 4673.

Luego, el Código Penal de 2012 –vigente a la fecha de los hechos en controversia– eliminó la figura del cooperador y volvió a penalizar la conducta del cooperador no necesario mediante una pena de autoría. Así, dispuso en el inciso (h) del Art. 44 que se considerará autor o autora los que "cooperan de cualquier otro modo en la comisión del delito". 33 LPRA sec. 5067 (enmendado 2014).[67] Por tanto, debemos auscultar en qué consiste la conducta del cooperador o cooperadora no necesaria. Entiéndase, precisar qué significa "cooperar de cualquier otro modo en la comisión del delito". Veamos.

Los cooperadores o cooperadoras no necesarios, llamados cómplices en el ordenamiento español, son los que "de forma

---

[67] Sin embargo, en el año 2014, la Asamblea Legislativa eliminó nuevamente el inciso (h) del Art. 44 y decidió volver a penalizar tal conducta de modo más benigno mediante la figura de la cooperación. Actualmente, el Art. 45 del Código Penal de 2012 enmendado provee que son cooperadores no necesarios "los que, con conocimiento, cooperan mediante actos u omisiones que no contribuyen significativamente a la consumación del delito. Al cooperador se le impondrá una pena equivalente a la mitad de la pena del autor, hasta un máximo de diez (10) años". 33 LPRA sec. 5068.

eficaz pero **no decisiva**, auxilian o facilitan la comisión de un crimen". (Énfasis suplido). Rodríguez-Villasante y Prieto, supra, pág. 32. "Lo que la distingue de las demás formas de participación es su menor entidad material, de tal forma que la calificación de complicidad hace que la cooperación se castigue automáticamente con la pena inferior en un grado a la prevista para los autores del delito". Muñoz Conde y García Arán, op. cit., págs. 445-446. En esencia, la persona que actúa como cooperador o cooperadora no necesaria aporta mediante una intervención de carácter secundario, sin la cual la acción delictiva podría haberse realizado igualmente.

A esos fines, la doctrina española ha resuelto que, en el caso de la cooperación no necesaria, "no es precisa una propia causalidad condicionante del resultado, sino que basta para la cooperación un **favorecimiento eficaz** del hecho". (Énfasis suplido). Mir Puig, op. cit., pág. 416. En ese sentido, los cooperadores y las cooperadoras no necesarias deben: (1) tener la intención o el conocimiento de que están aportado a una conducta delictiva, y (2) fomentar el hecho principal mediante su aportación o contribución. H. Welzel, Derecho Penal: Parte general (C. Fontán Balestra, trad.), Buenos Aires, Ed. Roque Depalma, 1956, pág. 124.

No obstante, lo anterior "**no significa que cualquier acto de favorecimiento o facilitación de la comisión de un**

**delito sea merecedor de la pena prevista para la complicidad [o la cooperación no necesaria]: la conducta habrá de tener alguna eficacia causal, aunque sea mínima, en el comportamiento del autor y reunir, además, una cierta peligrosidad**". (Énfasis suplido). Muñoz Conde y García Arán, op. cit., pág. 446. En ese sentido, el cooperador no necesario presta alguna "contribución causal a la comisión del hecho principal; por tanto, en los delitos de resultado, también una contribución al resultado". Welzel, op. cit. Dicho de otro modo:

> **[L]a mera peligrosidad de la acción no basta** para apreciar complicidad, pues será preciso, además, que el riesgo de favorecer la comisión del delito por el autor se traduzca en una efectiva cooperación (no necesaria) a la realización del mismo. **Así, una conducta, para ser considerada complicidad [o cooperación no necesaria], debe ser de tal manera causal, que realmente haya acelerado, asegurado o facilitado la ejecución del hecho o intensificado el resultado del delito en la forma en que era previsible.** (Énfasis suplido). Muñoz Conde García Arán, op. cit.

Por tanto, como puede apreciarse, la doctrina no exige que los actos del cooperador no necesario sean condicionantes a la ejecución del delito. Sin embargo, lo que sí requiere es que sus actos contribuyan realmente, aunque sea mínimamente, a la conducta delictiva.

Por último, es menester abundar en lo que distingue la cooperación necesaria de la cooperación no necesaria. Ello, es uno de los retos más discutidos en materia penal. Mir Puig, op. cit., pág. 413. Por ello, los tratadistas y expertos de la materia han elaborado una variedad de teorías

con el propósito de determinar qué constituye una aportación esencial e indispensable que justifica que la cooperación se catalogue como necesaria.

Uno de los acercamientos más comunes es la teoría de los bienes o servicios escasos.[68] Pueblo v. Sustache Sustache, supra, pág. 308. Según la misma, "la aportación del cooperador debe considerarse necesaria dependiendo de la escasez de la cosa o servicio que se facilitó". Chiesa Aponte, Derecho Penal Sustantivo, op. cit. Por un lado, si el bien o el servicio aportado es **escaso** y de **difícil obtención**, el partícipe se considerará un cooperador o cooperadora necesaria. Mir Puig, op. cit., págs. 413-414. Por otro lado, mientras más abundante sea el bien o servicio suplido, se tratará de un cooperador o cooperadora no necesaria. Íd.

---

[68]En Pueblo v. Sustache Sustache, 176 DPR 250 (2009), este Tribunal acudió, a su vez, a la teoría del dominio del hecho para distinguir entre la cooperación necesaria y la cooperación no necesaria. Íd., págs. 309-311. Sin embargo, tal como expone el profesor y tratadista Luis Ernesto Chiesa Aponte, la teoría del dominio del hecho no esclarece la controversia, pues los cooperadores, independientemente de que sean necesarios o no necesarios, precisamente carecen de dominio sobre el hecho delictivo. L.E. Chiesa Aponte, Autores y cooperadores, 79 Rev. Jur. UPR 1163, 1174 (2010). Es decir, "el dominio del hecho es una teoría cuyo propósito es distinguir entre autores y partícipes y no entre los partícipes que han de ser castigados como si fueran autores (i.e. inductores y cooperadores necesarios) y los que debe castigarse menos severamente (cooperadores no necesarios)". Íd., pág. 1173. Debido a lo anterior, el Profesor hace un llamado a este Tribunal para ofrecer un punto de partida más concreto y claro que permita distinguir efectivamente entre la cooperación necesaria y la cooperación no necesaria. Íd., pág. 1175.

De igual modo, otra teoría se enfoca en la **necesidad** de los actos realizados en pro de la consumación del delito. Pueblo v. Sustache Sustache, supra, pág. 307. Según ésta, la persona se considerará cooperadora necesaria cuando su aportación sea insustituible. M. C. López Peregrín, La complicidad en el delito, Valencia, Ed. Tirant Lo Blanch, 1997, pág. 412. Es decir, cuando ningún otro partícipe pudiese realizar su contribución en su lugar. De igual manera, se entenderá que la cooperación es necesaria cuando el autor o la autora del delito no podría ejecutar el delito sin su aportación. Íd., pág. 414. Por el contrario, en la medida en que la aportación sea fácilmente sustituible o cuando el autor o autora pueda realizar la conducta delictiva independientemente de la contribución, se tratará de un cooperador o cooperadora no necesario.

Otra teoría propuesta es aquella que evalúa la contribución psicológica o apoyo moral que provee un partícipe al autor o autora. Pueblo v. Sustache Sustache, supra, pág. 309. No obstante, esta teoría tiene más relevancia a fines de diferenciar entre un inductor y un cooperador o cooperadora no necesaria. Por un lado, se considerará un inductor o inductora quien, mediante apoyo moral, provoca intencionalmente que otra persona cometa un delito. Chiesa Aponte, Autores y cooperadores, supra, pág. 1182. De lo contrario, se tratará de un cooperador o cooperadora no necesaria cuando tal apoyo psicológico o

moral no fue determinante para la comisión de delito. Íd. Entiéndase, en ese caso, el autor o la autora hubiese cometido el delito, independientemente de la contribución moral que recibió del cooperador o cooperadora.

Asimismo, el profesor y tratadista Luis Ernesto Chiesa Aponte propone otros acercamientos teóricos, tal como la probabilidad de que se consumara exitosamente el delito. Chiesa Aponte, Autores y cooperadores, supra, pág. 1176. Mediante este análisis, se considerará que una persona es cooperadora necesaria si su contribución "**aumentó significativamente la probabilidad de que el delito fuera consumado exitosamente**". (Énfasis suplido). Íd., pág. 1177. Si la conducta o la aportación de una persona no aumentó significativamente la comisión del delito, se tratará de un cooperador o cooperadora no necesaria. Íd.

Además, se considerará que la cooperación es necesaria cuando se aporta o se contribuye un medio para cometer un delito que es **distinto** al que el autor o la autora se proponía utilizar inicialmente o, cuando se ayuda a cometer el delito de una manera más **privada**. Íd., págs. 1180-1182. En ambos supuestos tal cooperación tiene que cumplir con el criterio anterior, entiéndase, que la aportación aumente significativamente la probabilidad de que se consuma el delito exitosamente.

En fin, esta diversidad de criterios sirve para guiar la discreción de los tribunales al catalogar la

participación de una persona en la comisión de delitos. Sin embargo, ninguno de estos acercamientos es determinante y su aplicación dependerá de las circunstancias de cada caso. En ese análisis, el principio rector debe ser auscultar "si la ayuda del cooperador puede considerarse de **especial importancia** a la luz del plan del autor, en casos de acciones, o en torno al grado de control que tenía el cooperador sobre la conducta del autor, en casos de omisiones". Íd., pág. 1188.

Una vez explicada la distinción entre autoría y participación en el contexto penal, veamos los delitos en controversia.

## C.

El Código Penal de 2012 disponía en su Art. 93(a) que constituía asesinato en primer grado "[t]oda muerte perpetrada por medio de veneno, acecho o tortura, o con premeditación".[69] 33 LPRA sec. 5142. A esos fines, premeditación se ha definido como "la deliberación previa a la resolución de llevar a cabo el hecho luego de darle alguna consideración por un período de tiempo". Nevares-Muñiz, Código Penal de Puerto Rico, op. cit., pág. 140. La premeditación puede deducirse de las circunstancias particulares de cada caso, analizado la relación entre las

---

[69]Actualmente, el Art. 93(a) del Código Penal de 2012 provee que constituye asesinato en primer grado "[t]odo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento". 33 LPRA sec. 5142.

partes, sus actos y sus conductas. Pueblo v. López Rodríguez, 101 DPR 897, 899 (1974).

Por tanto, el asesinato en primer grado exige que la persona tenga la intención específica de matar y quitarle la vida a otra persona. Pueblo v. Negrón Ayala, 171 DPR 406, 419 (2007). A la luz de lo anterior, hemos dictaminado que "un asesinato podrá ser catalogado de primer grado si a la intención de matar se ha llegado después de darle alguna consideración, sin importar lo rápido que el acto de matar suceda a la formación definitiva de tal intención". Pueblo v. Concepción Guerra, 194 DPR 291, 305 (2015).

Por otro lado, la Ley de Armas de Puerto Rico, supra, proveía en su Art. 5.04 que toda persona que transportara o portara cualquier arma de fuego sin el correspondiente permiso para portar armas incurriría en un delito grave. 25 LPRA sec. 458c. De igual modo, el Art. 5.15 disponía que incurrirá en delito grave toda persona que voluntariamente disparara un arma de fuego en un sitio público. 25 LPRA sec. 458n.

Sin embargo, la posesión de un arma de fuego puede ser tanto física como constructiva. La posesión constructiva de un bien delictivo se materializa cuando, "a pesar de que una persona no tiene la posesión inmediata o tenencia física del objeto, tiene el poder e intención de ejercer el **control o dominio** sobre el mismo". (Énfasis suplido). Pueblo en interés menor F.S.C., 128 DPR 931, 940 (1991). En

consecuencia, **no constituye posesión constructiva la presencia ni la cercanía a un objeto delictivo**. Íd. Al contrario, para imputarle posesión constructiva a una persona que no tuvo control directo de un bien, hay que probar que tuvo conocimiento del mismo y control sobre éste. Pueblo v. Rivera Rivera, 117 DPR 283, 294 (1986).

Examinado el derecho aplicable, procedemos a resolver la controversia ante nuestra consideración.

### III

Según expuesto, corresponde evaluar si de la prueba desfilada en el Tribunal de Primera Instancia se desprende, más allá de duda razonable, que el peticionario es culpable de los siguientes delitos: (1) asesinato en primer grado, Artículo 93(a) del Código Penal de 2012; (2) portación y uso de armas de fuego sin licencia, Artículo 5.04 de la Ley de Armas de Puerto Rico, supra; y (3) disparar o apuntar armas, Artículo 5.15 de la Ley de Armas de Puerto Rico, supra.

No está en controversia que el Ministerio Público sí probó, más allá de duda razonable, que el peticionario incurrió en el delito de portación y uso de **armas blancas**, Artículo 5.05 de la Ley de Armas de Puerto Rico, supra. Según el propio peticionario, éste agredió al occiso con un taco de billar. Debido a lo anterior, no se requiere pasar juicio sobre la imputación de este delito.

En torno a los demás delitos, tampoco está en controversia el hecho de que el peticionario no es un autor

directo de los delitos imputados. Ello, pues quedó evidenciado que quien directamente portó un arma de fuego, disparó la misma y asesinó al señor García Batista fue su hermano, el señor Resto Laureano. Debido a lo anterior, el señor Resto Laureano fue convicto por los delitos reseñados. En consecuencia, resta analizar si el peticionario participó en la comisión de estos delitos en calidad de coautor, cooperador necesario o cooperador no necesario.

Para que el peticionario se considere coautor de los delitos reseñados, el Ministerio Público debió probar, más allá de duda razonable, lo siguiente: (1) que los hermanos Resto Laureano **acordaron mutua y previamente** cometer los delitos imputados, y (2) que el peticionario realizó una **contribución tan esencial a la consumación del delito, que sin ella no se hubiese podido ejecutar el mismo**. Recordemos, pues, que para que el peticionario sea un coautor, su retirada impediría la ejecución del delito.

Por otro lado, para que el peticionario se considere un cooperador necesario de los delitos reseñados, se debió probar que éste realizó una aportación **esencial e indispensable** a los mismos. Aunque no es requisito que haya tenido el dominio del hecho delictivo, se debió evidenciar que, sin la aportación del peticionario, su hermano **no hubiese podido** ejecutar los delitos en controversia. Es decir, que la contribución del peticionario fue de **especial importancia** a la luz del plan delictivo de su hermano.

Para precisar la necesidad y la esencialidad de la aportación del peticionario, se deben tomar en consideración las circunstancias particulares del caso ante nos, entre éstas: la necesidad de la aportación del peticionario, su importancia a la luz del plan delictivo de su hermano, la escasez del bien o del servicio aportado y si su aportación aumentó significativamente la probabilidad de que los delitos se hubiesen consumado exitosamente.

De no aplicar las figuras anteriores, se debe evaluar si el peticionario actuó como un cooperador no necesario. Entiéndase, si éste aportó eficazmente a la producción de un delito de manera subsidiaria y secundaria. Veamos.

Los testimonios y los videos presentados por el Ministerio Público evidenciaron que, en la noche en controversia, el señor Resto Laureano tuvo una discusión con el señor García Batista en un negocio. Aunque el peticionario llegó al lugar de los hechos junto a su hermano, se desprende de la prueba presentada que éste no participó inicialmente de la discusión. Una vez culminó la discusión, todas las partes involucradas salieron del negocio. Por un lado, el señor Resto Laureano persiguió a la víctima y a su pareja. En contraste, el peticionario no tomó la misma dirección que los demás y optó por irse hacia el área de la terraza.

Al salir, la señora Rodríguez, pareja del señor García Batista, procedió a golpear el vehículo donde se encontraban

las parejas de los hermanos Resto Laureano. En consecuencia, el peticionario agarró un taco de billar y se acercó hacia donde estaban todas las partes involucradas. En cuestión de segundos, el señor Resto Laureano le disparó al señor García Batista.

La señora Rodríguez relató que, al escuchar los disparos, se volteó y vio al señor García Batista caer al piso con un arma en la mano. El agente Cruz Román, oficial policiaco con diecinueve (19) años de experiencia en la Policía de Puerto Rico y con diez (10) años adscrito a la División de Homicidios, testificó que al observar los videos percibió que, en efecto, el señor García Batista portaba un arma la noche en controversia.

Inmediatamente, el peticionario procedió a darle dos (2) golpes con un taco de billar al señor García Batista. Luego de ello, los videos muestran un "forcejeo" entre el señor García Batista, el peticionario y la señora Rodríguez por un tramo aproximado de veinte (20) segundos.

Desafortunadamente, el señor García Batista falleció en la ambulancia de camino al hospital. El informe médico-forense mostró que la causa de la muerte del señor García Batista se debió **exclusivamente** a las heridas causadas por las balas del arma de fuego. Del mismo se desprende inequívocamente que el señor García Batista no tenía **ningún otro tipo de impacto o evidencia de daño corporal.**

Al evaluar la totalidad de esta evidencia, a la luz de los criterios de autoría vigentes, es forzoso concluir que no se probó, más allá de duda razonable, que el peticionario fue coautor de los delitos de asesinato, de portación de armas y de disparo de armas. La prueba presentada está huérfana de evidencia alguna que muestre que los hermanos Resto Laureano planificaron la comisión de estos delitos y que hubo una distribución de funciones entre ellos con ese propósito.

Para concluir que sí hubo tal planificación, pesó en el criterio del Tribunal de Apelaciones que los videos presentados alegadamente muestran que el peticionario señaló en dirección hacia el señor García Batista unos instantes antes de los disparos. Sin embargo, tras un estudio riguroso de los videos, no se puede aseverar con certeza que ese señalamiento ocurrió. Por tanto, tal evidencia es insuficiente para inferir razonablemente que el peticionario tenía la intención y el conocimiento pleno de un acuerdo en pro de quitarle la vida al señor García Batista. Ello, no produce certeza ni convicción moral de que los hermanos Resto Laureano planificaron previamente y distribuyeron entre ellos distintas funciones en aras de cometer un asesinato mediante un arma de fuego.

Así lo reconoció el agente Cruz Román, encargado de realizar la investigación del caso, quien testificó que de su investigación **no** surgió que el peticionario planificó o

acordó con el señor Resto Laureano quitarle la vida al señor García Batista. De igual modo, afirmó que de su investigación **no** se desprendió que el peticionario tenía conocimiento alguno sobre el arma que portaba el señor Resto Laureano.

Como agravante, la conducta del peticionario en la noche en controversia no muestra que éste tuvo dominio alguno sobre los hechos delictivos, ni que realizó una contribución **esencial** a la comisión del delito. Tampoco que tuvo conocimiento previo de que el peticionario portaba un arma de fuego ni, mucho menos, tuvo control o dominio alguno sobre el arma.

Ciertamente, la evidencia muestra que el peticionario actuó deplorable y delictivamente al golpear a otra persona con un taco de billar. Es por ello que el peticionario fue convicto correctamente por el delito de portación y uso de **armas blancas.** No obstante, ello no constituyó, de modo alguno, una aportación esencial a los delitos de asesinato y de portación de armas. Así quedó evidenciado claramente en el informe médico-forense, que dispone expresamente que el señor García Batista no tuvo daño corporal alguno más allá de las heridas de bala.

Como puede apreciarse, el señor Resto Laureano no necesitó contribución alguna de parte del peticionario para quitarle la vida al señor García Batista. De haberse retirado el peticionario, los delitos se hubiesen ejecutado

igualmente. Es decir, no se demostró que el peticionario tuvo dominio alguno sobre los hechos delictivos. La agresión ejercida por el peticionario tampoco fue una aportación necesaria, no adelantó los propósitos de su hermano, no constituyó una contribución de difícil obtención, no aumentó de manera alguna las probabilidades de que los delitos se consumaran exitosamente, ni constituyó una aportación de especial importancia a la luz de todas las circunstancias.

Distínganse los hechos ante nuestra consideración con la controversia que ocupó a este Tribunal en Pueblo v. Santiago et al., supra. Según adelantado, en aquella ocasión, el Tribunal responsabilizó al acusado en calidad de coautor porque éste, luego de presenciar una discusión entre varios individuos, ayudó a su hermano a buscar un arma, le suplió un arma de fuego que le pertenecía y lo acompañó al lugar de los hechos para que éste ejecutara el delito de asesinato. Mientras ello ocurría, el acusado obstruyó la salida del lugar donde se cometía el delito para evitar su paso. En este caso, se demostró más allá de duda razonable una planificación previa, una distribución de funciones y una contribución esencial a la comisión de los hechos.

En contraste, en esta ocasión, no se presentó evidencia que produjera certeza o convicción moral de que el peticionario acordó previamente quitarle la vida al señor García Batista. Más importante aún, no se demostró que el

peticionario haya realizado alguna aportación esencial o indispensable como coautor de los delitos.

En fin, es firme principio de la doctrina penal que, para que una persona se considere coautor o coautora de un delito, deben concurrir necesariamente ambos requisitos: (1) un plan previo, y (2) una aportación esencial a la comisión del delito. Al no probarse estos elementos más allá de duda razonable, los tribunales estamos impedidos de responsabilizar al peticionario como coautor de los delitos imputados. De igual modo, ante la evidente realidad de que el peticionario no realizó actos necesarios, indispensables ni esenciales a los delitos imputados, tampoco procedía imponerle una pena en calidad de cooperador necesario.

Debido a lo anterior, sólo resta auscultar si el peticionario actuó como un cooperador no necesario de los delitos de asesinato, portación de arma de fuego y disparo de arma de fuego. Como se expuso anteriormente, una persona se considerará cooperador o cooperadora no necesaria cuando su aportación a la conducta delictiva no sea decisiva ni determinante. Al contrario, una cooperación no necesaria es aquella de carácter secundario, sin especial importancia a la luz del delito cometido.

En el caso de epígrafe, la participación del peticionario en la actividad delictiva se reduce a que, luego de que el señor Resto Laureano le disparara a la víctima, éste lo golpeó con un taco de billar. Sin embargo,

como hemos reiterado, el informe médico forense revela que tales golpes no causaron la muerte del señor García Batista. De hecho, del mismo se desprende que tales golpes ni siquiera causaron algún daño corporal. Es decir, no existe un nexo causal **alguno** entre los actos del peticionario y los delitos imputados.

Ciertamente, para imputarle a una persona una cooperación no necesaria no se exige un estándar de causalidad condicionante a la comisión del delito. Sin embargo, la doctrina sí exige que los actos del cooperador no necesario auxilien o favorezcan de alguna manera, aunque sea mínimamente, los delitos cometidos. En vista de que, en el caso ante nos, se presentó evidencia fehaciente de que los actos del peticionario **no tuvieron efecto alguno** en el asesinato del señor García Batista, no procedía tampoco responsabilizarlo penalmente en calidad de cooperador no necesario.

En fin, lo único que el Ministerio Público probó, más allá de duda razonable, es que el peticionario actuó delictivamente al golpear al señor García Batista con un taco de billar. Es por ello que éste es indudablemente culpable del delito de portación y uso de armas blancas, Artículo 5.05 de la <u>Ley de Armas de Puerto Rico</u>, <u>supra</u>. Debido a lo anterior, el peticionario continuará cumpliendo la sentencia de seis (6) años impuesta por el Tribunal de Primera Instancia a esos fines.

En ese sentido, estoy convencido de que el Sr. Ángel M. Resto Laureano incurrió en la comisión de un delito, incluso hasta él mismo lo reconoce y no lo cuestiona. **Sin embargo, estoy convencido también de que su responsabilidad penal no puede extenderse al punto de resultar culpable por otros delitos cometidos por su hermano.** Ello, tras un estudio minucioso del derecho aplicable, especialmente de los criterios que exige nuestro ordenamiento para que una persona se considere coautora de un delito. Como hemos constatado, al aplicar el derecho vigente a la prueba presentada en el juicio, no me queda otra alternativa que concluir que la culpabilidad del Sr. Ángel M. Resto Laureano no se probó más allá de duda razonable respecto a los restantes delitos. Por tanto, respetuosamente disiento.


Luis F. Estrella Martínez
Juez Asociado